GANNETT SATELLITE INFORMATION NETWORK, INC., Plaintiff,

v.

METROPOLITAN TRANSPORTATION AUTHORITY, et al., Defendants.

No. 83 Civ. 5777 (WCC).

United States District Court, S.D. New York.

Jan. 24, 1984.

As Amended Feb. 6, 1984.

Nixon, Hargrave, Devins & Doyle, New York City and Tufo & Zuccotti, New York City, for plaintiff; Robert C. Bernius, Frank H. Penski, Rochester, N.Y., and Peter Tufo, Anita F. Barrett, New York City, Alice Neff Lucan, White Plains, N.Y., of counsel.

Mary P. Bass, Kathleen T. Walsh, New York City, David E. Bronston, Daniel Weisz, Legal Assts., for defendants.

OPINION AND ORDER

CONNER, District Judge.

This action presents interesting constitutional questions concerning the power of the Metropolitan Transportation Authority (the "MTA"), a public benefit corporation existing pursuant to Title 11 of Article 5 of the New York Public Authorities Law, § 1260 *et seq.*, to require newspapers to obtain a fee-bearing license prior to placing coin-operated newspaper vending machines

("newsracks") at commuter railroad stations owned or controlled by the MTA through its subsidiaries, the Long Island Railroad Company ("LIRR") and the Metro-North Commuter Railroad Company ("Metro-North") (collectively "MTA" or "defendants"). Plaintiff Gannett Satellite Information Network, Inc. ("Gannett"), publisher of the national daily newspaper *USA Today* commenced this action on August 4, 1983 pursuant to 42 U.S.C. § 1983, alleging that defendants' licensing scheme violates its rights under the First and Fourteenth Amendments to the United States Constitution and Article I, § 8 of the New York State Constitution. Gannett seeks to have the Court permanently enjoin defendants "from removing, tampering with, limiting, imposing fees or conditions upon, or in any other way disturbing the placement by plaintiff of newsracks in public areas of railroad passenger stations owned, operated, controlled, or maintained by defendants in the Metropolitan Area." Complaint at 15. The case is currently before the Court on the parties' cross-motions for summary judgment. For the reasons stated below, plaintiff's motion is granted.

*Background*

The following facts are undisputed:

Since at least 1965, several commercial newspapers have maintained newsracks at commuter train stations, owned or leased by defendants, pursuant to license agreements which require each newspaper to pay an annual fee of the greater of $25 per machine or $50 per station and to adhere to various conditions on the placement of the racks. *See* Def.Rule 3(g) Statement at § 1 ¶ 5; Def.Mem. in Opp. to Prelim.Inj. at 4; Ex. 9 to Boyle Aff. at 1–2. In September 1982, Gannett began to publish *USA To-*

*day,* a daily morning newspaper. On April 4, 1983, just one week before it planned to commence distributing *USA Today* in the New York area, plaintiff first contacted the MTA seeking permission to place newsracks at various LIRR and Metro-North stations. *See* Ex. G to Derle Aff. Although plaintiff never received approval from the MTA, on April 11, 1983 Gannett began distributing *USA Today* through newsracks which it had placed at both Metro-North and LIRR stations. *See* Pl.Rule 3(g) Statement at ¶ 18.[1] On April 13, the MTA informed Gannett that if it did not remove these "unauthorized" machines by Friday, April 15, MTA employees would remove them beginning on Monday, April 18. *See* Ex. G to Derle Aff. When plaintiff failed to retrieve its newsracks as directed, defendants carried out their threat and impounded the machines. *See* Pl.Rule 3(g) Statement at ¶ 20.

Following this seizure, defendants initially refused to allow Gannett to place *USA Today* newsracks at the MTA stations until Gannett entered into a license agreement. However, defendants subsequently agreed to allow Gannett to replace and leave its newsracks at the stations while representatives of the parties discussed a license agreement. *See* Ex. 7 to Boyle Aff.; Complaint at ¶ 30. On June 8, defendants provided plaintiff with two proposed license agreements, one for the LIRR stations and the other for Metro-North facilities. *See* Ex. 4 to Boyle Aff. On June 21, defendants sent plaintiff a revised draft of the proposed LIRR agreement. *See* Ex. 5 to Boyle Aff. Among the terms of those proposed agreements[2] was the requirement that Gannett pay an annual license fee of the greater of $75 per machine or $150 per station.[3] *See* Appendix A at 1; Appendix B

1. Pursuant to Rule 3(g) of the Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, the moving party on a motion for summary judgment is required to file a statement of the material facts about which it contends there is no genuine issue to be tried. The party opposing the motion must submit a statement of the facts which it contends are in dispute. Any facts set forth in the moving party's statement are deemed admit-

ted unless contradicted in the statement filed by the opposing party.

2. The proposed Metro-North and revised LIRR agreements are attached to this Opinion and Order as Appendices A and B, respectively.

3. At the time the MTA presented plaintiff with these proposed agreements, other newspapers, including the *New York Times,* were paying an

at 1. Ultimately, Gannett and the MTA failed to reach an accord on the terms of a license agreement, and in mid-July Gannett, upon orders from the MTA, removed its *USA Today* newsracks from the commuter stations.

*Discussion*

Gannett posits three separate theories to support its claim that defendants' licensing scheme is constitutionally infirm.[4] First, plaintiff contends that defendants have failed to establish any standards to govern the licensing of newsracks, and have delegated to their employees unbridled discretion to deny, limit or condition Gannett's constitutional right to place newsracks in commuter stations. Second, Gannett alleges that through their licensing scheme defendants seek to extract a fee that is not generally applicable to other entities, differs from fees imposed upon other newspapers, and constitutes a tax that singles out plaintiff and the press for special treatment. Finally, plaintiff claims that defendants' requirement that Gannett obtain a license and pay a fee for the privilege of placing newsracks on MTA property is an unconstitutional prior restraint on Gannett's First and Fourteenth Amendment rights.

■ It has long been settled that the freedoms of speech and press protected by the First Amendment[5] extend to the distribution of newspapers as well as to their publication. *See Lovell v. Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). Moreover, it is equally well established that this First Amendment protection is not lost merely because the paper being distributed is sold, rather than given away. *See Heffron v. International Society for Krishna Consciousness, Inc.*, 452

U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). Indeed, numerous courts have already held that because newsracks play an important role in the process of newspaper distribution, they are entitled to full constitutional protection. *See, e.g., Southern New Jersey Newspapers, Inc. v. New Jersey Dept. of Trans.*, 542 F.Supp. 173, 183 (D.N.J.1982); *Miami Herald Pub. Co. v. Hallandale*, No. 80–6535–Civ.–ALH, slip op. at 7 (D.Fla. July 1, 1981); *Westchester Rockland Newspapers, Inc. v. Yonkers*, 5 Media L.Rep. (BNA) 1777, 1780 n. 10 (S.D.N.Y.1979). Thus, Gannett's use of newsracks as a means of distributing *USA Today* is a constitutionally protected activity.

■ Gannett's right to distribute *USA Today* on public property is not, of course, absolute. "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Greenburgh Civic Assns.*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). Like a private landowner, the state has the power to preserve the property under its control for the uses to which it is lawfully dedicated. *Perry Educ. Assn. v. Perry Local Educ. Assn.*, —— U.S. ——, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *Eastern Conn. Citizens Action Group v. Powers*, 723 F.2d 1050 at 1054 (2d Cir. 1983). The character of the public property at issue will determine the existence of a right of access, and the standard by which limitations upon such a right must be evaluated. *Perry*, 103 S.Ct. at 954.

■ At one end of the spectrum are customary public forums—public places which either by long tradition or by government

---

annual fee at the rate of $25 per machine or $50 per station. Defendants assert, and this Court will assume as true for purposes of plaintiff's motion, that they are currently in the process of renegotiating and updating the fees paid by other newspapers. *See* Def.Rule 3(g) Statement at § II, ¶ 10; Boyle (10/27/83) Aff. at ¶ 1.

**4.** Plaintiff also alleges that defendants' actions violate Gannett's rights under Article I, § 8 of the New York Constitution. However, because

the parties have not addressed their arguments to the State claim, the Court is not prepared, without further briefing, to predict the manner in which the New York Court of Appeals would interpret the New York Constitution.

**5.** The First Amendment freedoms are, of course, among those fundamental rights protected by the Fourteenth Amendment from state infringement. *See Lovell v. Griffin*, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938).

fiat have been devoted to assembly and debate. *Id.* Quintessential examples of the public forum are streets and parks, which have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). When dealing with a public forum, the state is permitted to adopt reasonable regulations to govern the time, place, and manner of expression, so long as the regulations are content-neutral, are closely related to a significant governmental interest, and leave adequate alternative channels for communication. *E.g., Perry,* 103 S.Ct. at 955; *Greenburgh Civic Assns.,* 453 U.S. at 132, 101 S.Ct. at 2686; *New York City Unemp. & Wel. Council v. Brezenoff,* 677 F.2d 232, 237 (2d Cir.1982).

Beyond these traditional public forums, there is a category of state-created forums that have been opened for use by the public as places for expressive activity. *See, e.g., Widmar v. Vincent,* 454 U.S. 263, 267, 102 S.Ct. 269, 272, 70 L.Ed.2d 440 (1981) (university meeting facilities); *Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 175, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976) (open school board meeting). Even if the state was not required to create the forum in the first instance, and is under no obligation to retain its open character indefinitely, so long as it does so it is bound by the same constitutional strictures as apply to traditional public forums. *Perry,* 103 S.Ct. at 955; *Widmar,* 454 U.S. at 267–68, 102 S.Ct. at 272–73. Moreover, even if the area is not a traditional or designated public forum, but is used by the state for some other purpose, it may nevertheless be an appropriate forum for the exercise of First Amendment rights, so long as that exercise does not interfere with the use for which the place is primarily intended. *Brezenoff,* 677 F.2d at 237; *see Wolin v. Port of New York Authority,* 392 F.2d 83, 89 (2d Cir. 1968). However, because the state has a significant interest in reserving such a forum for its intended purposes, it may adopt, in addition to time, place, and manner restrictions, other reasonable regulations designed to ensure the normal functioning of the forum. *See Perry,* 103 S.Ct. at 955; *Brezenoff,* 677 F.2d at 238. As the Second Circuit recently stated

"The crucial question is whether the manner of expression is basically incompatible with the normal activities of a particular place at a particular time." If it is, the state may impose reasonable time, place or manner restrictions or may, in cases of unavoidable incompatibility, bar speech altogether.

*Eastern Conn. Citizens Action Group, supra,* at 1054, *quoting Grayned v. Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); *see, e.g., Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (upholding ban on political campaigning at military base).

Under this analysis, many courts, including particularly the Court of Appeals for the Second Circuit, have consistently recognized a First Amendment right of access to a broad range of public places which cannot be characterized as traditional public forums. In *Wolin,* for instance, the Second Circuit found the Port Authority Bus Terminal in Manhattan to be an appropriate place for the exercise of political expression wholly unrelated to the operation of buses and the transport of people. *See* 392 F.2d at 89–91. Relying on *Wolin,* the court in *Moskowitz v. Cullman,* 432 F.Supp. 1263 (D.N.J.1977), held that the PATH Terminal in Jersey City is a public forum in which political speech, including the distribution of leaflets, is a constitutionally protected activity. *See* 432 F.Supp. at 1266. The Fifth Circuit, in *Fernandes v. Limmer,* 663 F.2d 619 (5th Cir.1981), *reh'g en banc denied,* 669 F.2d 729, *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982), recognized a religious organization's right, subject to reasonable regulation, to distribute literature and solicit funds in the public concourses of the Dallas/Fort Worth Airport. *See id.* at 626–27; *see also U.S. Southwest Afri-*

ca/Namibia Trade & Cultural Council v. United States, 708 F.2d 760 (D.C.Cir.1983) (First Amendment freedoms apply in Dulles Airport). In each of these cases, the court looked to the physical layout of the property, and the heavy volume of use by pedestrians in determining that the forum was an appropriate place for the exercise of First Amendment activities. See, e.g., U.S. Southwest Africa, 708 F.2d at 764–65; Wolin, 392 F.2d at 90–91. Similarly, in Wright v. Chief of Transit Police, 558 F.2d 67 (2d Cir.1977), the Second Circuit acknowledged that absent a finding that reasonable regulation would be impractical, the Socialist Workers Party could not be banned from selling Socialist newspapers in the New York City subway system, see id. at 68–69, and in Brezenoff, the same court ruled that the waiting rooms of New York City welfare centers are appropriate forums for the exercise of First Amendment activities concerning welfare issues. See Brezenoff, 677 F.2d at 238. Finally, in its most recent decision, the Second Circuit Court of Appeals held that a nonprofit citizens group had a constitutionally protected right, subject to appropriate time, place and manner regulation, to use a state-owned railway bed as a forum for political expression. See Eastern Conn. Citizens Action Group, supra, at 1054–55.

In light of these authorities, it is clear that the commuter train stations owned or operated by the MTA through its subsidiary corporations, the LIRR and Metro-North, are particularly appropriate places to engage in the constitutionally protected activity of distributing newspapers through newsracks. The stations are open to all who choose to use them, and in that sense they must be considered public areas. See Brezenoff, 677 F.2d at 238. The elements comprising a station variously include station buildings, platforms, walkways, sidewalks, and covered and uncovered shelters, which are used, inter alia, by persons to board or exit from commuter trains. See Pl.Rule 3(g) Statement at ¶ 13; Def.Rule 3(g) Statement at § III, ¶ 4. Indeed, in a major metropolitan area, these suburban stations serve as a marshalling area and conduit through which many commuters pass daily. Rail passengers frequently seek reading material to occupy their time in transit, and morning commuters in particular habitually read the morning newspapers on their inbound trips to work. The suburban stations are thus a uniquely attractive site for the distribution of newspapers. Cf. Wolin, 392 F.2d at 90.

■ There can, of course, be no doubt that the commuter stations at issue here are but one aspect of the state's overall endeavor to provide efficient mass transportation to, from, and among the northern and eastern suburbs of New York City: Were there no train service, there would be no reason to maintain at public expense these commuter stations. But merely because the primary purpose for these stations is related to transportation, the state, in this case the MTA, does not have unchecked power to bar or to condition the exercise of First Amendment rights. It is only where the proposed First Amendment exercise is "unavoidably incompatible" with the use to which the property is dedicated that a would-be communicator will not enjoy a protected right of access and the state may constitutionally ban expression altogether. See Eastern Conn. Citizens Action Group, supra, at 1054; see also Fernandes, 663 F.2d at 626.

■ Gannett's proposed distribution of USA Today through newsracks at the commuter stations is, however, plainly not incompatible with or disruptive of the transportation-related function of the forum. Defendants concede that considerable speech-related activities, including sales of newspapers from both newsstands and newsracks, are carried on at their facilities. See Def.Rule 3(g) Statement at § I, ¶ 6. Indeed, since at least 1965, other publishers have sold their newspapers through newsracks located at defendants' stations, see id. at § I, ¶ 5, which is the precise First

Amendment exercise in which Gannett seeks to engage.[6]

Thus, the instant case is quite unlike *Greenburgh Civic Assns.*, relied upon by defendants, where the Court found that a civic group did not have a protected right to hand-distribute its literature through postal letter boxes rather than mailing the communications, or *Greer v. Spock*, where the Court ruled that a military base did not provide a public forum for the general dissemination of political views. *See Greenburgh Civic Assns.*, 453 U.S. at 128–30, 101 S.Ct. at 2684–85; *Greer*, 424 U.S. at 838, 96 S.Ct. at 1217. In both *Greer* and *Greenburgh Civic Assns.*, the Court concluded that no constitutionally protected forum existed because the proposed exercise of First Amendment rights was inconsistent with the government's interest in maintaining the facility for its intended purpose. *See Greenburgh Civic Assns.*, 453 U.S. at 128–30, 101 S.Ct. at 2684–85; *Greer*, 424 U.S. at 837–38, 96 S.Ct. at 1217. As demonstrated by, among other factors, the pattern of newspaper sales currently allowed at defendants' facilities, Gannett's proposed activity suffers from no such incompatibility.

Nor, despite defendants' best arguments to the contrary, is this case similar to *Lehman v. Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), where a divided Court ruled that a political advertiser was not constitutionally guaranteed access to the advertising space on public streetcars. *See* 418 U.S. at 302–03, 94 S.Ct. at 2716–17. The result in *Lehman* rests, in large part, upon an application of the captive audience doctrine consistently with the fears of a majority of the Justices that streetcar riders, who are confined in the car as a matter of necessity, have no choice but to be "subjected to the blare of political propaganda." 418 U.S. at 302,

304, 94 S.Ct. at 2716, 2717; *see id.* at 307, 94 S.Ct. at 2719 (Douglas, J., concurring); *see also Greenburgh Civic Assns.*, 453 U.S. at 140 n. 7, 101 S.Ct. at 2690 n. 7 (Brennan, J., concurring). No such problem exists in the instant case, where the proposed First Amendment activity is the entirely innocuous distribution by machine of a commercial newspaper in a forum that, unlike the streetcar in *Lehman*, is not unduly confined, and contains waiting rooms, concourses, passageways, and platforms that are in many ways analogous to the street corners and meeting halls which are the traditional public forums. *Cf. Lehman*, 418 U.S. at 303, 94 S.Ct. at 2717 ("Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare."). Accordingly, I find that the MTA commuter stations are appropriate forums for Gannett to exercise its First Amendment right to distribute *USA Today*.

In holding that Gannett has a protected right to distribute *USA Today* at the train stations, I do not mean to suggest that the MTA is completely powerless to regulate that activity. As noted above, the state is permitted to adopt reasonable regulations to govern the time, place and manner of expression, so long as those regulations are content-neutral, are closely related to a significant governmental interest, and are the least restrictive means of serving that interest. *See, e.g., Perry*, 103 S.Ct. at 955; *Heffron*, 452 U.S. at 647–48, 101 S.Ct. at 2563–64; *Brezenoff*, 677 F.2d at 237. However, where, as here, the state requires one to obtain a license prior to engaging in a protected activity, the Court must be cognizant that "[p]rior restraints on speech, even in the form of restrictions rather than prohibition, are heavily disfavored and must be construed as narrowly as possi-

---

**6.** The sale of newspapers through newsracks at defendants' facilities by the *New York Times* and others has been allowed by defendants subject to certain conditions, including payment by the distributor or publisher of a license fee. At this stage of the inquiry, however, the Court is not concerned with the permissible scope of any conditions the MTA may seek to impose upon Gannett's proposed sale of newspapers, but only with whether Gannett has a right to engage in

this constitutionally protected activity at the LIRR and Metro-North stations. This latter inquiry depends solely upon the nature of the proposed First Amendment activity in light of the character of the intended forum. *See Eastern Conn. Citizens Action Group, supra*, at 1054. Any evaluation of the validity of the MTA's regulatory scheme must await the results of this preliminary examination.

ble." *Eastern Conn. Citizens Action Group, supra,* at 1055.

It has long been settled that any law conditioning the exercise of First Amendment freedoms upon the issuance of a license must contain "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). Any procedure which "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub v. Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958); *see Shuttlesworth,* 394 U.S. at 151, 89 S.Ct. at 938; *Cox v. Louisiana,* 379 U.S. 536, 557, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965); *414 Theatre Corp. v. Murphy,* 499 F.2d 1155, 1159 (2d Cir.1974); *Wolin,* 392 F.2d at 93. Laws or rules granting an official or agency such unbridled discretion are inherently inconsistent with valid time, place or manner regulation, because they have the potential for becoming a means of suppressing a particular point of view. *Heffron,* 452 U.S. at 649, 101 S.Ct. at 2564.

Applying this reasoning, the Court in *Staub* struck down an ordinance which required a permit from the mayor and city council of Baxley, Georgia prior to the solicitation of members for any dues-paying organization. *See* 355 U.S. at 314 n. 1, 325, 78 S.Ct. at 278 n. 1, 284. Although the ordinance required the mayor and city council to consider, in acting upon the application, the character of the applicant, the nature of the business of the organization for which members are desired to be solicited, and its effects upon the general welfare of the citizens of the city, the ultimate decision to grant; or deny the necessary permit rested in the uncontrolled discretion of these city officials. Accordingly, the Court ruled that the ordinance was unconstitutional on its face. *Id.* at 325, 78 S.Ct.

at 284. Similarly, in *Wolin,* the Second Circuit held unconstitutional regulations governing the Port Authority Bus Terminal which, in practical terms, vested the terminal manager with unfettered discretion to deny an applicant access to the terminal for the purpose of distributing leaflets. 392 F.2d at 93. The court stated:

> The effect of the present regulations is to empower a single official to refuse access on his mere opinion that a denial will prevent inconvenience and disorder. By such devices official authority can become "an instrument of arbitrary suppression of opinion on public questions.

*Id., quoting Cox v. New Hampshire,* 312 U.S. 569, 571, 61 S.Ct. 762, 763, 85 L.Ed. 1049 (1941); *accord 414 Theatre Corp.,* 499 F.2d at 1159 (total lack of standards governing issuance, renewal and revocation of licenses conferred virtually absolute power on city commission; "dissemination of material protected by the First Amendment cannot be left to the unguided discretion of a city commissioner"); *Hull v. Petrillo,* 439 F.2d 1184, 1186 (2d Cir.1971) ("sweeping power granted the mayor by the terms of the ordinance to determine who is to receive a license goes well beyond the level of discretion permitted city officials in regulating the exercise of First Amendment rights").

Under this standard, the MTA's current licensing scheme must fail. Before a commercial newspaper will be granted permission to place any newsracks on MTA property, the newspaper must enter into an agreement with one of the institutional defendants. Although defendants have a standardized draft agreement, *see* Def.Rule 3(g) Statement at § II, ¶ 4, they contend that they are willing in each case to negotiate the final terms of a license agreement with the individual publisher. *See id.* at § II, ¶¶ 2–3; Boyle Aff. at ¶ 8. Thus, they concede the possibility that the terms of a licensing agreement may vary among different newspapers who enter into such agreements. *See* Pl.Rule 3(g) Statement at ¶ 26.

Moreover, the MTA has no rules or regulations governing the process of negotiating or granting licenses for newsracks. In a letter dated July 27, 1983, Mary Bass, Esq., General Counsel to the MTA, in response to a request by plaintiff under the New York Freedom of Information law for all "records containing MTA regulations, rules, policies or ordinances relating to the placement, operation and/or maintenance in MTA passenger stations" of newsstands and coin-operated vending machines, including newsracks, stated that:

There are no rules, regulations or ordinances as such. The fundamental policy, to maximize Authority revenues consistent with public safety and operations, is incorporated into the contracts ....

It is MTA policy not to allow candy, soda, cigarette, food or hot drink vending machines in passenger stations.

Ex. E to Derle Aff.

In their Rule 3(g) Statement, defendants assert merely that all MTA policy is subject to the provisions of the Equal Protection clause. *See* Def.Rule 3(g) Statement at § III, ¶ 9.

The MTA's failure to govern the placement of newsracks at its commuter stations on the basis of explicit standards renders the current licensing scheme constitutionally defective. In each of the cases noted above, the governing laws, ordinances or regulations were struck down because they vested too much discretion in a government official to regulate the exercise of First Amendment activities. The instant licensing scheme goes beyond all of those cases, and suffers from a complete absence of any legislative directives or established agency rules relating to the use of MTA stations as forums for First Amendment activities. Under the existing procedure, individual employees of the MTA who are responsible for negotiating license agreements have unfettered authority to impose whatever conditions they seek on license applicants under the guide of contract negotiations. As the MTA candidly admits, there exist no ascertainable standards to guide the employees in their nego-

tiations beyond the vague outlines of the Equal Protection Clause and the goal of maximizing Transit Authority revenues. Ultimately, if the applicant does not accede to the terms demanded by MTA negotiators, it will not receive a license to place newsracks at commuter stations. Moreover, although the MTA employees may promise to exercise their discretion evenhandedly, the fact that the terms of a license agreement are negotiable on a case-by-case basis, without narrowly drawn guidelines, gives rise to the potential for improper discrimination among different applicants.

While the process of negotiation may be a proper, or indeed preferred, procedure for the MTA to deal in its proprietary capacity with other commercial vendors, it is an unacceptable practice for regulating the exercise of a constitutionally protected right. One should not have to bargain individually for the privilege of exercising a right guaranteed him by the Constitution of the United States. Accordingly, the MTA's current licensing scheme is an unconstitutional prior restraint on Gannett's protected right to distribute *USA Today* at the commuter train stations.

The Court recognizes that the MTA has legitimate interests in maintaining the safety of its commuter stations, ensuring the efficient flow of passengers, and generally avoiding disruption of activities relating to the transportation function of the stations. However, these concerns can be addressed through promulgation of precise rules or regulations governing the placement of newsracks at the commuter stations, rather than through the unregulated licensing scheme currently in effect. The Court will not, and indeed without additional evidence could not, prescribe in detail the permissible standards for such regulations. That task is, in the first instance, properly the function of the MTA. *See Wolin,* 392 F.2d at 93–94. But, because the parties hotly dispute the propriety of the fee provision contained in the draft LIRR and Metro-North agreements proposed to Gannett by

the MTA, some general guidelines on that matter may be appropriate.

 The gravamen of Gannett's dissatisfaction with the conditions proposed by the MTA concerns the demand that Gannett pay a fee of up to $150 per station for the privilege of placing its *USA Today* newsracks at the stations. It is firmly established that while a state may impose a fee to cover expenses incidental to the administration of the activity to be licensed, *Cox v. New Hampshire,* 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941), it may not otherwise "impose a charge for the enjoyment of a right granted by the Federal Constitution." *Murdock v. Pennsylvania,* 319 U.S. 105, 113, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943); *accord Eastern Conn. Citizens Action Group, supra,* at 1056 ("Licensing fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose."); *Fernandes,* 663 F.2d at 633 (same); *United States Labor Party v. Codd,* 527 F.2d 118, 119–20 (2d Cir.1975) (same); *Hull v. Petrillo,* 439 F.2d 1184, 1186 (2d Cir.1971) ("[A]ny fee imposed as a prerequisite to the exercise of the right to communicate ideas on the public sidewalks is an unconstitutional prior restraint upon the freedom of expression."); *Miami Herald, supra,* slip op. at 10–12 (striking down revenue-raising fee on newsracks); *Wright v. Chief of Transit Police,* 558 F.2d 67, 69 (2d Cir.1977) (Transit Authority permitted to charge fee related to administrative expense for privilege of selling newspapers in subway). Defendants in the instant case plainly state that the fee they propose to charge Gannett, and other commercial newspapers, is a revenue-raising measure, and is not tied to any administrative costs that may result from allowing the sale of newspapers through newsracks. *See* Def.

Rule 3(g) Statement at ¶¶ 4–6; Boyle Aff. at ¶ 6.

While the Court recognizes that defendants seek to maximize the value of their resources and to capitalize upon the commercial value of the station locations to newspaper distributors for the purpose of partially subsidizing commuter transportation, such a plan is impermissible when the area sought to be exploited is a public forum.[7] If the law were otherwise, the parks department could presumably subsidize the upkeep of its parks by revenue charges on would-be speakers, and the public works department could similarly subsidize the maintenance of its roads by charging those who seek to distribute leaflets on the street corners. Such a result is repugnant to the traditional concept of First Amendment freedoms. Although the MTA might constitutionally charge ordinary commercial ventures for the privilege of selling their products on MTA property, "[f]reedom of press, freedom of speech, [and] freedom of religion are in a preferred position." *Murdock,* 319 U.S. at 115, 63 S.Ct. at 876. On its face, therefore, the license fee the MTA seeks to impose upon Gannett is an unconstitutional charge.

*Conclusion*

For the reasons stated above, the Court finds that the procedure followed by defendants for the licensing of newsracks at the commuter train stations is unconstitutional. The Court directs that within sixty (60) days of the date of this Opinion and Order, defendants adopt, and submit to the Court for approval, explicit rules, regulations, or standards to govern the issuance of a license to place newsracks at their commuter stations.[8] In adopting those rules, regulations or standards, defendants are reminded that they may constitutionally impose only time, place, and manner

---

7. *But see Lehman,* 418 U.S. at 303–04, 94 S.Ct. at 2717. In *Lehman,* the plurality, in finding that streetcar advertising space was not a public forum, recognized the legitimacy of the transit authority's revenue raising interest. Here, however, the open locations at which Gannett seeks to place its machines are, for that purpose, public forums. I do not mean to suggest in this Opinion that the display cases and other adver-

tising areas at the stations, constructed by the MTA for the express purpose of raising revenues from commercial advertising, should be classified similarly. *See id.* at 304, 94 S.Ct. at 2717.

8. The commuter stations which are involved in the instant dispute are set forth in Appendix C.

conditions, which are reasonable in light of the nature of the newspaper distribution process and necessary to preserve the purpose and efficient operation of the train stations, and may not charge a revenue-raising fee. In the interim period, Gannett will be permitted to place its *USA Today* newsracks at the commuter stations, without concurrent payment of any fees, and under the conditions, reasonably interpreted, contained in the MTA's draft agreements, appended hereto as Exhibits A and B. Any fees subsequently established and approved will be retroactively applicable to this interim period.

This action will be transferred to the Suspense docket of this Court pending defendants' submission of their rules, regulations or standards.

SO ORDERED.

## APPENDIX A

THIS AGREEMENT made to take effect the day of 1983, between MET-RO–NORTH COMMUTER RAILROAD COMPANY, a public benefit subsidiary corporation of Metropolitan Transportation Authority a public benefit corporation of the State of New York, having an office at 347 Madison Avenue, New York, New York 10017 herein after referred to as Licensor, of the one part, and referred to as Licensee, of the other part:

WITNESSETH, that Licensor, at the request of Licensee, hereby extends to Licensee the right, privilege and license, revocable or terminable as hereinafter provided, to place and maintain, at Licensee's sole cost and expense, newspaper vending machines for the sale of Licensee's newspapers in and about Licensor's property in the States of New York and Connecticut at such locations as shall be approved in writing by Licensor.

TOGETHER with the right of ingress and egress over adjoining land of Licensor to service aforesaid vending machines, but only by such route or routes as may be from time to time prescribed by Licensor.

IT BEING UNDERSTOOD AND AGREED that Licensee upon its execution of this license will provide Licensor with a list of proposed newspaper vending machine locations in a form similar to the attached (identified as Exhibit A) for Licensor's approval. Any additions or deletion to the list will require Licensee to request Licensor's approval prior to the installation or deletion of the newspaper vending machines. Licensee will pay Licensor annually, or part thereof as rental, $150.00 per station or $75.00 per machine at each station, whichever is greater. Upward adjustments shall be payable upon Licensor's written approval of the new locations, however, downward adjustments shall be made on an annual basis to reflect the number of machines on railroad property as of January 1st. Said payments shall be made on or before the first of January each year to Metro North/MTA at P.O. Box 2318, Grand Central Station, New York, New York 10163.

IT BEING FURTHER UNDERSTOOD AND AGREED by Licensee that it shall and will under penalty of forfeiture of the privilege herein granted, keep the area assigned free and clear of all debris and other refuse at all times and will leave the premises in a clean and orderly condition at the end of each day; toward this end Licensee agrees to arrange for the disposition of all newspapers, wire, bindings and other refuse at its own cost and expense.

AND IT BEING FURTHER UNDERSTOOD AND AGREED that all employees and all vending machines, vehicles and other appurtenances employed or used by Licensee for the purpose authorized herein shall be satisfactory to Licensor. The employees and agents of Licensee, while upon the premises of Licensor, shall conduct themselves in a proper manner and shall comply with the directions and regulations of Licensor, and all vending machines, vehicles and other appurtenances used by Licensee under the terms of this agreement shall be kept clean and maintained in a condition satisfactory to Licensor.

Licensee, at Licensee's expense, will keep and maintain, change, strengthen, improve, relocate or remove any and all of its newspaper vending machines upon request of Licensor, so that Licensor may repair, renew, change, improve, make additions to or perform other work in respect to its property. Licensee will comply with provisions of all laws, ordinances and requirements of public authorities in respect to the privilege hereby given, and will pay to Licensor, promptly upon receipt of a bill therefor, the amount of all taxes and license fees which may be levied or assessed against Licensor by reason of the location, maintenance and use of said property and will comply with all laws and ordinances requiring payment direct to the public authorities by Licensee of license fees and taxes on the privilege, and upon the revenue or receipts derived therefrom by Licensee.

Licensee will not use the said premises or exercise the license or privilege hereby extended for any other purpose than as aforesaid, or permit any other person or persons, corporation or corporations, to use the same for any purpose whatsoever.

Licensee will not have any interest or estate in the property of Licensor, nor will Licensee have or claim by any lapse of time by virtue hereof, or otherwise, any right or title adverse to Licensor.

As part consideration hereof, Licensee covenants and agrees to release and hereby releases, and agrees to defend, indemnify, protect, and save harmless, Licensor, its officers, employees, successors and assigns, from and against any and all losses, damages, detriment, suits, claims, costs and expenses, which Licensor may directly or indirectly suffer, sustain, be subjected to, or for which it may be held liable growing out of or on account of or incident to the construction, placement, attachment, maintenance, repair or removal of Licensee's improvements, structures, goods and property, or its or their existence, presence, or use (including any interruption in such use or loss of contents, if any), or other work of Licensee in respect to this agreement, as well as any use of property of Licensor, whether such losses and damages be suffered or sustained by Licensor directly or by its employees, patrons or licensee, or be suffered or sustained by other persons, including but not limited to Licensee, Licensee's employees and agents, who may seek to hold Licensor liable therefor, whether attributable to any condition of the property, use thereof by or operations thereon of Licensor, and whether attributable to the fault, failure or negligence of Licensor, its officers or employees, or otherwise.

Licensee will be responsible for and will indemnify, save harmless and defend Licensor against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, damage to or loss of property of Licensor, Licensee, or of agents, servants or employees of either, or of any other person, and against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, injury to or death of persons, including agents, servants or employees of Licensor or of Licensee, or any other person (including Licensee if a natural person), which said damage, loss, injury or death shall arise in any manner, directly or indirectly, out of or incidental to or in connection with, this lease of the demised premises, or the use or occupation thereof, including any appurtenant sidewalks or driveways.

Licensee specifically agrees to relieve Licensor of any and all liability for damage to contents of the demised premises owned by or in the custody of Licensee, or improvements therein owned by Licensee, whether damaged by fire and extended coverage perils or other casualty.

Licensee shall provide and maintain in effect during the term and any continued term of this license a policy of public liability insurance, including contractual liability covering liability assumed by Licensee. Said insurance shall be in limits of not less than $500,000.00 bodily injury and $100,000 property damage, and shall be in companies and form acceptable to Licensor.

Policy or policies of fire, extended coverage or other insurance on property of Licensee or in Licensee's care and custody shall contain a waiver of subrogation against Licensor.

Licensee shall furnish to Licensor complete copies of all such insurance policies with evidence of payment of premiums therefor upon request of Licensor. All such policies shall be endorsed to provide not less than ten (10) days' notice to Licensor of any cancellation thereof and of any material change in coverage.

The providing of said insurance coverages shall not be deemed a limitation on the liability of Licensee as provided in this license but shall be additional security therefor.

The policy or policies mentioned herein shall include Licensor, Metropolitan Transportation Authority, Connecticut Department of Transportation and their subsidiaries, successors, assigns, officers, agents and employees as additional named insureds and certificates of such insurance shall be forwarded to Licensors Manager Real-Estate Administration at 347 Madison Avenue, 10th Floor, New York, New York 10017.

Licensee shall affix an information sticker on the front of each newspaper vending machine which shall include an identification number and a telephone number where refunds can be requested and problems reported. All correspondence shall refer to these identification numbers.

Licensee will not place a newspaper vending machine within one hundred (100) feet of a licensed newsstand.

The above mentioned premises located on the Harlem and Hudson Lines are managed by Metro-North Commuter Railroad Company, for and on behalf of Metropolitan Transportation Authority pursuant to the Harlem-Hudson Lease Agreement between Metropolitan Transportation Authority and George P. Baker, Richard C. Bond, Jervis Langdon, Jr., and Willard Wirtz jointly, as they are the Trustees of Penn Central Transportation Company, Debtor dated June 27, 1972.

The above mentioned premises located in the States of New York and Connecticut on the New Haven Line are managed by Metro-North Commuter Railroad Company for and on behalf of Connecticut Department of Transportation and Metropolitan Transportation Authority pursuant to The New Haven Suburban Passenger Train Service Agreements between Connecticut Department of Transportation, Metropolitan Transportation Authority, and George P. Baker, Richard C. Bond, Jervis Langdon, Jr., and Willard Wirtz jointly, as they are the Trustees of Penn Central Transportation Company, Debtor dated October 27, 1970.

Either party hereto shall have the right to terminate this License at any time by giving to the other at least Ten (10) days' notice, in writing, by legal service of the intention so to do and upon the expiration of such notice this agreement shall cease and terminate, and the Licensee, at Licensee's sole cost and expense, shall during the period limited in said notice of termination remove its improvements, structures, goods and property from the premises and restore said premises and deliver possession thereof to the Licensor in as good order, repair and condition as when received and in a condition satisfactory to the Licensor; if the Licensee shall neglect, fail or refuse so to do, Licensor may without further notice to the Licensee and without liability to the Licensee, make such removal and restoration and Licensee agrees to pay or reimburse Licensor therefor on demand, and Licensee agrees that its failure so to remove and restore shall constitute an abandonment of its said improvements, structures, goods and property and its title thereto, and Licensor may make any disposition thereof, including but not limited to junking or sale thereof and giving title thereto, without being liable to Licensee or any other person, persons, corporation, or corporations for any damage or compensation or any action for or on account of same. Licensee releases and shall defend,

protect, indemnify and save harmless Licensor from any such liability.

Notices given under the terms of this License shall be deemed sufficiently served if, in the case of notice to Licensee, such is mailed to Licensee by certified or registered United States Mail, or is delivered personally to Licensee, at Licensee's address set forth on the first page hereof, or at such other place as Licensee may from time to time designate in writing to Licensor; and, if, in the case of notice to Licensor, such notice is mailed to Licensor, by certified or registered United States Mail to Licensor's Real Estate Department office at 347 Madison Avenue, New York, New York 10017. Attention Director-Real Estate or at the office of Licensor where rental payments are to be made by Licensee, or at such other place where Licensor may from time to time designate in writing to Licensee. In computing the number of days specified in any notice given, the date of mailing or personal service as the case may be, shall be counted as the first day.

Licensee shall not assign or transfer this license in whole or in part or sublet the facilities whatsoever; and Licensee shall not mortgage or otherwise encumber or permit to be encumbered the term or any continued term hereof, or any part thereof, or any facilities now or hereafter placed on railroad property. Any assignment or transfer by merger, consolidation, operation of law or proceedings in equity, bankruptcy, insolvency or reorganization, or any transfer of a controlling interest of the stock of Licensee to persons not now in control, shall be deemed to be an assignment within the meaning of this provision.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day One Thousand Nine Hundred and ,19

As to Licensor

Metro North Commuter Railroad Company

By ——————————————————

 Peter E. Stangl

 President

As to Licensee

By: ——————————————————

Title ————————————————————

## APPENDIX B

THIS AGREEMENT made to take effect the day of 1983, between The Long Island Railroad Company, a public benefit subsidiary corporation of Metropolitan Transportation Authority a public benefit corporation of the State of New York, having an office at Jamaica Station Bldg., Jamaica, New York 11435 herein after referred to as Licensor, of the one part, and referred to as Licensee, of the other part;

WITNESSETH, that Licensor, at the request of Licensee, hereby extends to Licensee the right, privilege and license, revocable or terminable as hereinafter provided, to place and maintain, at Licensee's sole cost and expense, newspaper vending machines for the sale of Licensee's newspapers in and about Licensor's property in the States of New York and Connecticut at such locations as shall be approved in writing by Licensor.

TOGETHER with the right of ingress and egress over adjoining land of Licensor to service aforesaid vending machines, but only by such route or routes as may be from time to time prescribed by Licensor.

IT BEING UNDERSTOOD AND AGREED that Licensee upon its execution of this license will provide Licensor with a list of proposed newspaper vending machine locations in a form similar to the attached (identified as Exhibit A) for Licensor's approval. Any additions or deletions to the list will require Licensee to request Licensor's approval prior to the installation or removal of the respective newspaper vending machines. Licensee will pay Licensor annually, or part thereof as rental, $150.00 per station or $75.00 per machine at each station, whichever is greater. Upward adjustments shall be payable upon Licensor's written approval of the new locations, however, downward adjustments shall be made on an annual basis to reflect

the number of machines on railroad property as of January 1st. Said payments shall be made on or before the first of January each year to the Licensor's Treasurer Jamaica Station Bldg., Jamaica, New York 11435

IT BEING FURTHER UNDERSTOOD AND AGREED by Licensee that it shall and will under penalty of forfeiture of the privilege herein granted, keep the area assigned free and clear of all debris and other refuse at all times and will leave the premises in a clean and orderly condition at the end of each day; toward this end Licensee agrees to arrange for the disposition of all newspapers, wire, bindings and other refuse at its own cost and expense.

AND IT BEING FURTHER UNDERSTOOD AND AGREED that all employees and all vending machines, vehicles and other appurtenances employed or used by Licensee for the purpose authorized herein shall be satisfactory to Licensor. The employees and agents of Licensee, while upon the premises of Licensor, shall conduct themselves in a proper manner and shall comply with the directions and regulations of Licensor, and all vending machines, vehicles and other appurtenances used by Licensee under the terms of this agreement shall be kept clean and maintained in a condition satisfactory to Licensor.

Licensee, at Licensee's expense, will keep and maintain, change, strengthen, improve, relocate or remove any and all of its newspaper vending machines upon request of Licensor, so that Licensor may repair, renew, change, improve, make additions to or perform other work in respect to its property. Licensee will comply with provisions of all laws, ordinances and requirements of public authorities in respect to the privilege hereby given, and will pay to Licensor, promptly upon receipt of a bill therefor, the amount of all taxes and license fees which may be levied or assessed against Licensor by reason of the location, maintenance and use of said property and will comply with all laws and ordinances requiring payment direct to the public authorities by Licensee of license fees and taxes on the privilege, and upon the revenue or receipts derived therefrom by Licensee.

Licensee will not use the said premises or exercise the license or privilege hereby extended for any other purpose than as aforesaid, or permit any other person or persons, corporation or corporations, to use the same for any purpose whatsoever.

Licensee will not have any interest or estate in the property of Licensor, nor will Licensee have or claim by any lapse of time by virtue hereof, or otherwise, any right or title adverse to Licensor.

As part consideration hereof, Licensee covenants and agrees to release and hereby releases, and agrees to defend, indemnify, protect, and save harmless, Licensor, its officers, employees, successors and assigns, from and against any and all losses, damages, detriment, suits, claims, costs and expenses, which Licensor may directly or indirectly suffer, sustain, be subjected to, or for which it may be held liable growing out of or on account of or incident to the construction, placement, attachment, maintenance, repair or removal of Licensee's improvements, structures, goods and property, or its or their existence, presence, or use (including any interruption in such use or loss of contents, if any), or other work of Licensee in respect to this agreement, as well as any use of property of Licensor, whether such losses and damages be suffered or sustained by Licensor directly or by its employees, patrons or licensee, or be suffered or sustained by other persons, including but not limited to Licensee, Licensee's employees and agents, who may seek to hold Licensor liable therefor, whether attributable to any condition of the property, use thereof by or operations thereon of Licensor, and whether attributable to the fault, failure or negligence of Licensor, its officers or employees, or otherwise.

Licensee will be responsible for and will indemnify, save harmless and defend Licensor against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, damage to or loss of

property of Licensor, Licensee, or of agents, servants or employees of either, or of any other person, and against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, injury to or death of persons, including agents, servants or employees of Licensor or of Licensee, or any other person (including Licensee if a natural person), which said damage, loss, injury or death shall arise in any manner, directly or indirectly, out of or incidental to or in connection with, this lease of the demised premises, or the use or occupation thereof, including any appurtenant sidewalks or driveways.

Licensee specifically agrees to relieve Licensor of any and all liability for damage to contents of the demised premises owned by or in the custody of Licensee, or improvements therein owned by Licensee, whether damaged by fire and extended coverage perils or other casualty.

Licensee shall provide and maintain in effect during the term and any continued term of this license a policy of public liability insurance, including contractual liability covering liability assumed by Licensee. Said insurance shall be in limits of not less than $500,000 combined single limit for bodily injury property damage, and shall be in companies and form acceptable to Licensor.

Policy or policies of fire, extended coverage or other insurance on property of Licensee or in Licensee's care and custody shall contain a waiver of subrogation against Licensor.

Licensee shall furnish to Licensor complete copies of all such insurance policies with evidence of payment of premiums therefor upon request of Licensor. All such policies shall be endorsed to provide not less than ten (10) days' notice to Licensor of any cancellation thereof and of any material change in coverage.

The providing of said insurance coverages shall not be deemed a limitation on the liability of Licensee as provided in this license but shall be additional security therefor.

The policy or policies mentioned herein shall include Licensor, Metropolitan Transportation Authority, and their subsidiaries, successors, assigns, officers, agents and employees as additional named insureds and certificates of such insurance shall be forwarded to Licensor's Manager Real-Estate Administration at 347 Madison Avenue, 10th Floor, New York, New York 10017.

Licensee shall affix an information sticker on the front of each newspaper vending machine which shall include an identification number and a telephone number where refunds can be requested and problems reported. All correspondence shall refer to these identification numbers.

Licensee will not place a newspaper vending machine within one hundred (100) feet of a licensed newsstand.

Either party hereto shall have the right to terminate this License as to any or all locations at any time by giving to the other at least Ten (10) days' notice, in writing, by legal service of the intention so to do and upon the expiration of such notice this agreement shall cease and terminate, and the Licensee, at Licensee's sole cost and expense, shall during the period limited in said notice of termination remove its improvements, structures, goods and property from the premises and restore said premises and deliver possession thereof to the Licensor in as good order, repair and condition as when received and in a condition satisfactory to the Licensor; if the Licensee shall neglect, fail or refuse so to do, Licensor may without further notice to the Licensee and without liability to the Licensee, make such removal and restoration and Licensee agrees to pay or reimburse Licensor therefor on demand, and Licensee agrees that its failure so to remove and restore shall constitute an abandonment of its said improvements, structures, goods and property and its title thereto, and Licensor may make any disposition thereof, including but not limited to junking or sale thereof and giving title thereto, without being liable to Licensee or

any other person, persons, corporation, or corporations for any damage or compensation or any action for or on account of same. Licensee releases and shall defend, protect, indemnify and save harmless Licensor from any such liability.

Notices which may or are required to be given pursuant to this License shall be deemed sufficiently served if, in the case of notice to Licensee, such is mailed to Licensee by certified or registered United States Mail, or is delivered personally to Licensee, at Licensee's address set forth on the first page hereof, or at such other place as Licensee may from time to time designate in writing to Licensor; and, if, in the case of notice to Licensor, such notice is mailed to Licensor, by certified or registered United States Mail to Licensor's Real Estate Department office at 347 Madison Avenue, New York, New York 10017, Attention Director-Real Estate or at the office of Licensor where rental payments are to be made by Licensee, or at such other place where Licensor may from time to time designate in writing to Licensee. In computing the number of days specified in any notice given, the date of mailing or personal service as the case may be, shall be counted as the first day.

Licensee shall not assign or transfer this license in whole or in part or sublet the facilities whatsoever; and Licensee shall not mortgage or otherwise encumber or permit to be encumbered the term or any continued term hereof, or any part thereof, or any facilities now or hereafter placed on railroad property. Any assignment or transfer by merger, consolidation, operation of law or proceedings in equity, bankruptcy, insolvency or reorganization, or any transfer of a controlling interest of the stock of Licensee to persons not now in control, shall be deemed to be an assignment within the meaning of this provision.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day One Thousand Nine Hundred and , 19

As to Licensor

The Long Island Rail Road Company

By _____

 Robin H.H. Wilson
 President and General Manager

As to Licensee

By: _____

Title _____

## APPENDIX C

### WESTCHESTER – CONNECTICUT

1. Tuckahoe – Northbound side alongside stationhouse
2. Fleetwood – inside
3. Bronxville – Northbound side
4. Mt. Vernon West – outside station
5. Mt. Vernon East – South side at stairs
6. Larchmont – Southbound side at top of stairs
7. Southbound platform
8. Northbound side parking lot
9. Mamaroneck – Southbound side at stairs
10. Northbound side of stairs
11. Harrison – Southbound platform
12. Northbound parking lot
13. White Plains – South side parking lot at bus stop
14. Crestwood – upstairs walkway
15. + 16. Scarsdale – Northbound parking lot (2)
17. Southbound platform
18. Brewster Train station – platform
19. Montrose Train Depot – platform
20. Crugers Train Depot – near entrance
21. Croton Harrison Depot – parking lot alongside entrance
22. Pleasantville Train Depot – in front of entrance;
23. platform

WESTCHESTER–CONNECTICUT

24. + 25. Thornwood R.R. Station – by entrance; by station
26. Hawthorne R.R. Station – platform
27. Mt. Kisco R.R. Station – by entrance; by southbound
28. tracks
29. + 30. North White Plains R.R. – by entrance; platform
31. Philipse Manor R.R. – in front of depot
32. Irvington R.R. Station – Southbound platform;
33. Northbound by entrance
34. + 35. Tarrytown R.R. Station – Southbound alongside entrances
 (2)
36. Scarborough R.R. – Southbound by entrance
37. Ossining R.R. – center platform
38. (3) N. end of Southbound platform
39. overpass by entrance
40. Dobbs Ferry R.R. – inside station
41. Greystone R.R. – by entrance to overpass
42. Glenwood R.R. – on overpass
43. Fairfield R.R. Station – inside station
44. Southport R.R. Station – on platform
45. Westport R.R. Station – in front of station;
46. (2) at foot of stairs
47. Green Farms R.R. Station – next to station
48. Norwalk R.R. Station – next to station Northbound
49. East Norwalk – next to stairs
50. Old Greenwich R.R. Station – next to steps
51. Riverside R.R. Station – on platform
52. Cos Cob Station – on platform
53. Stamford – along entrance Southbound
54. (2) alongside of stairway Northbound
55. Springdale R.R. Station – next to stairs Eastbound
56. Rowayton R.R. Station –
57. Talmidge R.R. Station – next to stairs Eastbound
58. Glenbrook R.R. Station – on Eastbound side alongside of platform
59. Wilton – next to station
60. Darien – on platform Southbound
61. Cannondale – platform
62. New Canaan – inside station
63. Ludlow R.R. – platform

LONG ISLAND RAILROAD STATIONS

1. Great Neck Station – Westbound, on platform
2. Manhasset Station – Westbound, downstairs, to be filled by the existing newsstand operator when he closes after morning business hours.
3. Manhasset Station – Upstairs at Westbound entrance
4. Sea Cliff Station – Alongside station house approximately 10 feet from entrance
5. Glen Head Station – Westbound, on platform at entrance from parking lot
6. Steward Manor Station – Alongside station house
7. Locust Valley Station – Alongside station house
8. Locust Valley Station – Westbound, at stairwell from parking area
9. Mill Neck Station – Westbound, on platform
10. Oyster Bay Station – Westbound, on platform

## LONG ISLAND RAILROAD STATIONS

11. Merilon Station – Westbound, on platform
12. Nassau Blvd. Station – Westbound, on platform
13. Mineola Station – Westbound, on platform
14. East Williston Station – Alongside station house
15. Bethpage Station – Westbound, on platform
16. Bethpage Station – In parking area
17. Malverne Station – Westbound, on platform
18. Baldwin Station – Alongside stairwell at entrance from parking area
19. Merrick Station – Alongside stairwell from parking area
20. Merrick Station – Alongside stairwell from parking area
21. Seaford Station – Westbound, on platform
22. Massapequa Station – Alongside station house
23. Massapequa Park Station – Alongside stairwell to Westbound platform
24. Massapequa Park Station – Alongside stairwell to Westbound platform
25. Massapequa Park Station – Alongside stairwell to Westbound platform
26. Cedarhurst Station – Westbound on platform
27. Lawrence Station – Alongside station house
28. Island Park Station – Alongside station house
29. Cold Springs Harbor Station – Alongside newsstand so that newsdealer can fill rack after he closes for business in the morning
30. Deer Park Station – Alongside station house
31. Copaique Station – Alongside station house
32. Lindenhurst Station – Alongside station house
33. Bayshore Station – Alongside station house
34. Islip Station – Alongside station house
35. Republic Station – Westbound, on platform
36. Wyandanch Station – Westbound, on platform