**GANNETT SATELLITE INFORMATION NETWORK, INC., Plaintiff-Appellee,**

v.

**METROPOLITAN TRANSPORTATION AUTHORITY, Long Island Rail Road Company, Metro-North Commuter Railroad Company, Richard Ravitch, individually and as Chairman of Metropolitan Transportation Authority, Long Island Rail Road Company and Metro-North Commuter Railroad Company, Constantine Sidamon-Eristoff, Ronay Menschel, and Jane K. Butcher, individually, as members of the Boards, and as members of the Real Estate Committees of Metropolitan Transportation Authority, Long Island Rail Road Company, and Metro-North Commuter Railroad Company, Marsilia A. Boyle, individually and as Director of Real Estate of Metropolitan Transportation Authority, and Lawrence H. Levine and Kenneth Rydzewski, individually and as Deputy Directors of Real Estate of Metropolitan Transportation Authority, Defendants-Appellants.**

No. 1394, Docket 84–7111.

United States Court of Appeals, Second Circuit.

Argued June 18, 1984.

Decided Sept. 28, 1984.

---

Mary P. Bass, General Counsel, Metropolitan Transp. Authority, New York City (Barbara Dixon, Lester G. Freundlich, Metropolitan Transp. Authority, New York City, of counsel), for defendants-appellants.

Robert C. Bernius, Rochester, N.Y. (Frank H. Penski, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., Peter Tufo, Anita Barrett, Tufo & Zuccotti, New York City, Alice Neff Lucan, Asst. Gen. Counsel, Gannett Co., Inc., Rochester, N.Y., of counsel), for plaintiff-appellee.

George Freeman, The New York Times Co., Brenda Baker, Dow Jones & Co., Inc., Marjorie T. Coleman, New York News Inc., John Bender, News Group Publications, Inc., New York City, for amici curiae, N.Y. Times Co., Dow Jones & Co., Inc., N.Y. News Inc. and News Group Publications, Inc.

Before MANSFIELD, MESKILL and CARDAMONE, Circuit Judges.

MESKILL, Circuit Judge:

The defendants appeal a summary judgment entered by the United States District Court for the Southern District of New York, Conner, J., 579 F.Supp. 90 (S.D.N.Y. 1984), holding that the Metropolitan Transportation Authority's (MTA) licensing scheme for the placement of coin operated newspaper vending machines (newsracks) in MTA commuter train stations and MTA's licensing fees for such placement violated the First and Fourteenth Amendments. The court did not prohibit the issuance of licenses, but enjoined the imposition of revenue raising fees and ordered the adoption of reasonable standards governing license terms and procedures for license issuance. The court limited the permissible standards to reasonable time, place and manner restrictions necessary to preserve "the purpose and efficient operation of the train stations." *Id.* at 100.

We disagree with the court's holding that MTA's imposition of revenue raising licensing fees necessarily violates the First Amendment. We also disagree that MTA's current licensing scheme is a prior restraint of the press in violation of the First Amendment and that MTA must adopt reasonable standards to govern the issuance and terms of licenses.

## BACKGROUND

MTA is a public benefit corporation organized under the Metropolitan Transportation Authority Act, N.Y.Pub.Auth.Law §§ 1260 through 1278 (McKinney 1982), which, through its subsidiaries, the Long Island Rail Road Company and Metro-North Commuter Railroad Company, operates the Long Island, Harlem, Hudson and New Haven commuter railroad lines. In 1981, the MTA system encompassed 213 stations and carried approximately 451,850 passengers each work day. The state acquired these privately owned lines after their "financial situation and physical condition" deteriorated, because the "[e]fficient and adequate transportation of commuters within the New York metropolitan area is of vital importance to the commerce, defense and general welfare of the people of the New York metropolitan area, the state, and the nation." 1965 N.Y.Laws c. 324, § 1(1) and (2). MTA was given authority to establish the "fares, tolls, rentals, rates, charges and other fees" for the use and operation of its facilities necessary to maintain its operations on a "self-sustaining basis." N.Y.Pub.Auth.Law §§ 1261(14) and 1266(3) (McKinney 1982).

Since at least 1965, MTA has permitted the placement of newsracks in its stations' public areas, but has permitted no other types of vending machines. A newspaper distributor seeking to install newsracks must sign a written licensing agreement which establishes the conditions for newsrack placement and provides for the payment of an annual fee. Until 1983, the several distributors who maintained news-

racks in MTA stations each paid an annual fee of the greater of $25 per machine or $50 per station.[1]

Although MTA has standardized drafts of the licensing agreements, it is willing to negotiate the final terms of each agreement. MTA also has no rules or regulations governing the negotiation process or the issuance of licenses. The only standard guiding employees who negotiate or issue licenses is MTA's policy of maximizing its revenues.

On April 4, 1983, Gannett Satellite Information Network, Inc. (Gannett) sought MTA's permission to place about 100 newsracks for its new morning publication *USA Today* in public areas of MTA stations.[2] Each newsrack measured two feet by one and one-half feet by two feet, thus occupying three square feet of floor space, and was to be affixed to the station or platform with chains or bolts. Gannett installed its newsracks without MTA permission on April 11, 1983. MTA directed Gannett to remove the newsracks within five days. When Gannett failed to do so, MTA impounded the machines. Gannett and MTA then began to negotiate licensing terms and Gannett was allowed to maintain its newsracks in MTA stations during the term of the negotiations. MTA's proposed licensing agreements required licensing fees of the greater of $75 per machine or $150 per station, about $13,000 for all of the newsracks. When Gannett and MTA were unable to agree on the terms of the licensing agreements, MTA ordered Gannett to remove the *USA Today* newsracks in mid-July of 1983.

On August 4, 1983, Gannett brought the present action seeking to enjoin MTA from interfering, through the imposition of fees or conditions, with Gannett's placement of *USA Today* newsracks in MTA stations. Gannett claimed that its right to distribute newspapers through newsracks was protected by the First and Fourteenth Amendments and that MTA's licensing scheme and fees violated these rights because (1) MTA had failed to establish standards to govern the issuance of licenses and had thus given its employees unlimited discretion in prohibiting or conditioning the placement of Gannett's newsracks; (2) MTA's licensing fees were a tax singling out the press and specifically Gannett; and (3) MTA's licensing requirement and fees operated as a prior restraint.[3]

Both parties moved for summary judgment; the court granted Gannett's motion. The court held that Gannett's sale of its newspapers through newsracks is protected by the First Amendment. The court then determined that the public areas of MTA stations, although not traditional or designated public forums, are appropriate forums for newsrack distributions. It held that MTA could license the placement of newsracks, but any licensing restrictions would have to be content-neutral reasonable time, place and manner regulations necessary to preserve "the purpose and efficient operation of the train stations." 579 F.Supp. at 100. MTA's existing licensing scheme, the court ruled, was an unconstitutional prior restraint because MTA, by not adopting guidelines for license issuance, had given its employees too much discretion in the granting of licenses and

1. Several of these distributors, The New York Times Co., Dow Jones & Co., Inc., New York News Inc. and News Group Publications, Inc., submitted a brief as *amici curiae* in support of Gannett's position.

 Gannett, through its subsidiary, Westchester Rockland Newspapers, Inc., entered into an agreement with MTA in 1979 for the placement of newsracks to distribute another publication.

2. *USA Today* is a nationally circulated publication. Gannett planned to begin distribution of the publication in the New York metropolitan area on April 11, 1983.

 The list of proposed locations is appended to the district court's opinion as Appendix C, 579 F.Supp. at 106–08.

3. Gannett also alleged that MTA had violated its rights under Article 1, § 8 of the Constitution of the State of New York. The district court did not reach this claim.

 Gannett moved to enjoin MTA preliminarily from interfering with the placement of its *USA Today* newsracks. The district court never reached this motion, but instead granted Gannett's motion for summary judgment and permanently enjoined some of MTA's practices.

the negotiation of licensing terms. The court also held that the licensing fees were an unconstitutional prior restraint because the fees did not reflect the administrative costs of licensing, but were intended to raise revenue. Consequently, the court ordered MTA to stop charging revenue raising licensing fees and to submit for the court's approval, within sixty days, rules, regulations and standards to govern license issuance, licensing terms and administrative fees.

## DISCUSSION

MTA's primary claim on appeal is that the district court erred in holding that its revenue raising licensing fees are an unconstitutional prior restraint on Gannett's right to distribute newspapers through newsracks in the public areas of MTA stations. MTA argues that the efficient operation of its commuter passenger service requires that it maximize revenue from its facilities and that the licensing fees serve this revenue raising function. MTA first claims that the public areas of its stations are not appropriate public forums for newsrack distribution and that the fees are permissible regulations to reserve the stations for their intended function, the raising of revenue. Alternatively, it argues that even if the public areas of its stations are public forums, the licensing fees are valid time, place and manner restrictions serving the significant governmental interest of raising revenue for the efficient, self-sufficient operation of the commuter lines.

We do not address MTA's claim that the licensing fees are permissible regulation of non-forum public property because we hold that the MTA stations are appropriate forums for the exercise of Gannett's First Amendment right to distribute its newspapers through newsracks. But, because licensing fees serve the significant governmental interest of raising revenue for the efficient, self-sufficient operation of the rail lines, we hold that they can be valid time, place and manner restrictions on Gannett's right to place its newsracks in those areas.

Without question, Gannett's sale of *USA Today* is protected by the First Amendment. *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). *See Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981) (*ISKCON*) ("[First Amendment] protection is [not] lost because the written materials sought to be distributed are sold rather than given away ...."). The protection of the First Amendment extends to the sale of newspapers through newsracks. *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 673 (11th Cir.1984); *Southern New Jersey Newspapers, Inc. v. New Jersey Department of Transportation,* 542 F.Supp. 173, 183 (D.N.J.1982).

However, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *ISKCON,* 452 U.S. at 647, 101 S.Ct. at 2563 (citations omitted). In other words, MTA may restrict Gannett's right to distribute its newspapers through newsracks in MTA stations. The extent to which MTA may restrict Gannett's right depends upon how the station's public areas are characterized for the purposes of First Amendment analysis. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983) (*Perry*). Public property is divided into three categories for this analysis, each of which is governed by different First Amendment standards. *Id.* at 45–46, 103 S.Ct. at 954–55. "At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* at 45, 103 S.Ct. at 954–55 (citation omitted). "A second category consists of public property which the state has opened for use by the public as a place for expressive activity." *Id.* The third is "[p]ublic property which is not by tradition or designation a forum for

public communication." *Id.* at 46, 103 S.Ct. at 955. The public areas of the MTA stations are in the third category. *See U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760, 764–66 (D.C.Cir.1983) (*Southwest Africa*) (holding public areas of airport in third category); *Fernandes v. Limmer,* 663 F.2d 619, 626 (5th Cir.1981) (same), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982).

Public property, like the public areas of MTA stations, which is neither a traditional nor a designated public forum, can still serve as a forum for First Amendment expression if the expression is appropriate for the property, *Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1054 (2d Cir.1983) (*ECCAG*), and is not "incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). A particular expression is appropriate for a public property if the expression is relevant to the property or if the property provides the relevant audience. *ECCAG,* 723 F.2d at 1054 (quoting *Wolin v. Port of New York Authority,* 392 F.2d 83, 90 (2d Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968)). If the expression is inappropriate for the property or is incompatible with the intended use of the property, then the expression may be totally barred and the property is considered a "non-forum." *Perry,* 460 U.S. 46–49, 103 S.Ct. 955–57; *see Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

The public areas of MTA stations are appropriate forums for the sale of newspapers through newsracks. The thousands of commuters who pass through the stations each day provide a ready market for morning newspapers. *See New York City Unemployed and Welfare Council v. Brezenoff,* 677 F.2d 232, 238 (2d Cir.1982) (*Brezenoff*) (welfare office appropriate forum to reach welfare recipients on welfare issues). The presence of newsracks is not incompatible with the operation of MTA stations; since at least 1965, several publishers have maintained newsracks in the stations. *See Southwest Africa,* 708 F.2d at 768–70 (airport appropriate forum for political advertising); *Wright v. Chief of Transit Police,* 558 F.2d 67, 68 (2d Cir. 1977) (subway station appropriate forum for sale of newspapers); *Wolin v. Port of New York Authority,* 392 F.2d at 90 (bus terminal appropriate forum for distribution of leaflets); *Moskowitz v. Cullman,* 432 F.Supp. 1263, 1266–67 (D.N.J.1977) (bus/train terminal appropriate forum for distribution of leaflets).

Even though MTA stations are appropriate forums for newsrack newspaper sales, MTA may impose reasonable time, place and manner restrictions on newsrack placement. *Perry,* 460 U.S. at 49, 103 S.Ct. at 957. "[R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence,* —— U.S. ——, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (*Clark*) (citations omitted). MTA argues that licensing fees are permissible manner restrictions because they are content-neutral, leave open alternative means to distribute newspapers and are the least restrictive means of serving MTA's interest in raising revenue for the efficient, self-sufficient operation of the commuter lines. We agree.

There is no question that fees are content-neutral; they are imposed upon any newspaper desiring to install newsracks in the public areas of MTA stations. MTA explained that the lower fees charged other distributors result from the age of the other agreements and agreed to adopt any required regulations to safeguard content-neutrality. Br. for Appellants at 22, 26. Gannett's claim that MTA discriminates against newspapers because MTA does not charge other types of vendors for the use of MTA property is misleading.

MTA does not allow other types of vendors to install coin-operated vending machines. Thus, the newspapers are in a privileged position and are not and will not become the victims of discrimination. *See Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 1374, 75 L.Ed.2d 295 (1983) (different tax rate for newspapers unacceptable in part because of *potential* discrimination against newspapers).

Even if MTA's proposed licensing fees were so high that they rendered newsrack newspaper sales economically infeasible, Gannett would still have ample alternative means to distribute its newspapers to MTA commuters. Gannett could place newsracks on streets or sidewalks near the stations. *See ISKCON,* 452 U.S. at 654–55, 101 S.Ct. at 2567–68 (solicitation outside of fairgrounds alternative channel for limited solicitation on fairgrounds). Gannett could also use peripatetic news vendors or existing newsstands to sell its newspapers in MTA stations. Although the alternative distribution method may be more costly, the First Amendment does not guarantee a right to the least expensive means of expression. *See ISKCON,* 452 U.S. at 654–55, 101 S.Ct. at 2567–68 (state need not provide free access to fairgrounds for solicitation); *Kovacs v. Cooper,* 336 U.S. 77, 88–89, 69 S.Ct. 448, 454–55, 93 L.Ed. 513 (1949) (plurality opinion) (city may restrict soundtrucks even though they are cheapest means of communication). Therefore, Gannett cannot successfully argue that the more expensive alternative distribution methods deprive it of its First Amendment right to distribute its papers. *Cf. Martin v. Struthers,* 319 U.S. 141, 146, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943) (door-to-door solicitations "essential to the poorly financed causes of little people"). As a large commercial distributor, it should be ready to absorb increases in the cost of doing business. *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* — U.S. —, 104 S.Ct. 2118, 2133 n. 30, 80 L.Ed.2d 772 (1984) ("[S]pecial solicitude for forms of expression that are much less expensive than feasible alternatives ... has practical boundaries ....").

The only remaining question is whether MTA's interest in raising revenue for the efficient, self-sufficient operation of its commuter lines justifies the restriction that the licensing fees place on Gannett's exercise of its First Amendment rights.

Ordinarily, a government cannot profit by imposing licensing or permit fees on the exercise of a First Amendment right. *Murdock v. Pennsylvania,* 319 U.S. 105, 113–14, 63 S.Ct. 870, 875–76, 87 L.Ed. 1292 (1943); *Cox v. New Hampshire,* 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941); *Hull v. Petrillo,* 439 F.2d 1184, 1186 (2d Cir.1971). Only fees that cover the administrative costs of the permit or license are permissible. *ECCAG,* 723 F.2d at 1056. In those cases in which licensing fees were prohibited, however, the government was acting in a governmental capacity and was raising general revenue under the guise of defraying its administrative costs. *See Murdock v. Pennsylvania,* 319 U.S. at 112–15, 63 S.Ct. at 874–76 (license tax on right to solicit door-to-door); *ECCAG,* 723 F.2d at 1056 (fee to demonstrate on abandoned railroad bed); *Hull v. Petrillo,* 439 F.2d at 1185–86 (ordinance prohibiting sale of goods, including newspapers, without town license).

In imposing licensing fees, MTA is not acting in a traditional governmental capacity. Although the state's purpose in acquiring and operating the railroads is to preserve the state's economy by providing efficient commuter passenger service, N.Y. Pub.Auth.Law § 1264 (McKinney 1982) ("essential governmental function"), the management of station facilities is a proprietary, not a governmental function. *See Helvering v. Powers,* 293 U.S. 214, 223, 55 S.Ct. 171, 172, 79 L.Ed. 291 (1934) (state operation of street railroad is business enterprise); *People v. Witherspoon,* 52 Misc.2d 320, 323, 275 N.Y.S.2d 592 (N.Y. Dist.Ct.1966) ("Insofar as ... management, direction or control [of the Long Island Rail Road] is directed towards the actual operation, the function is governmental. Insofar as such management, direction or control is *incidental* to the actual operation, the

function is proprietary."). Before state acquisition, the MTA lines were privately operated commercial ventures. Their acquisition by the state does not change their essentially commercial nature. *See Helvering v. Powers,* 293 U.S. at 223, 55 S.Ct. at 172. The legislature attempted to preserve the lines' commercial status by establishing MTA as a public benefit corporation and by making MTA a "self-sustaining" entity. N.Y.Pub.Auth.Law §§ 1264 & 1266(3) (McKinney 1982). Any revenue raised by the MTA does not go into the general coffers but is used for the operation of the railroad lines. N.Y.Pub.Auth.Law § 1266(3).

■ When a government agency is engaged in a commercial enterprise, the raising of revenue is a significant interest. *See Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion) (protecting revenue from long-term commercial advertisements one justification for restricting advertising content on bus placards); *Southwest Africa,* 708 F.2d at 768 (government's interest in raising revenue could provide "substantial" or "compelling" state interest to justify subject matter restrictions on advertising); *Post Newsweek Stations-Connecticut, Inc. v. Travelers Insurance Co.,* 510 F.Supp. 81, 86 (D.Conn.1981) (revenue from future broadcast contracts justifies banning unauthorized television broadcasts of sporting events from city owned coliseum). MTA can impose licensing fees if its interest in producing revenue outweighs the burdens that the fees place on Gannett's right to distribute its newspapers. *Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 473–74 (2d Cir.1980) ("[T]he question becomes one of balancing, based on the nature of the forum, the governmental interest in enforcing the restrictions against the inhibitions the restrictions impose on the speech-related activity."), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981). If Gannett were to place its news-

racks on privately owned business property it undoubtedly would have to pay rent to the owner of the property. The fact that the business property in question is owned by the MTA should confer no special benefit on Gannett. The MTA's interest here clearly outweighs the burden imposed on Gannett's First Amendment rights.

■ Providing commuter service is economically burdensome and the New York legislature established MTA as a "self-sustaining" entity. N.Y.Pub.Auth.Law § 1266(3). To provide efficient, economical, self-sufficient commuter transportation, MTA must raise revenue from all of its facilities. Fees from commercial users of MTA facilities constitute a substantial source of revenue. MTA grosses $15 million annually from fees placed on newsstands, book stores, newsracks and advertising located on its property. Gannett proposes to install 100 newsracks, permanently occupying 300 square feet of MTA's commercially valuable property, without paying MTA anything for the space. If MTA's licensing fees for Gannett's newsracks were found unconstitutional, its revenues from other businesses within the ambit of First Amendment protections, for example, advertising, newsstands and other distributors' newsracks, would be endangered. Thus, the effect on MTA's revenue raising interest would be substantial.

■ Consequently, the licensing fees are permissible manner restrictions which serve the significant governmental interest of raising revenue for the self-sufficient, efficient operation of commuter lines. The raising of revenue necessarily entails the charging of fees or rentals. There is obviously no less restrictive means for MTA to raise revenue than to charge for the use of its facilities or services.[4] *See Clark,* —— U.S. at ——, 104 S.Ct. at 3071–72 (least restrictive means test applied); *Brezenoff,* 677 F.2d at 238 (same).

MTA does not challenge the court's requirement that it adopt regulations to

---

4. We do not address the question of what constitutes a reasonable fee or how such a fee must be determined. MTA is in a better position to establish commercially viable fee arrangements than is the court. *See Clark,* —— U.S. at ——, 104 S.Ct. at 3071–72 (scope of regulations necessary

for protection of parks left in hands of Park Service).

The marketplace provides protections against unreasonable licensing fees. Gannett believes that newsrack newspaper sales is the most cost

guide its employees in granting licenses and determining licensing terms. MTA states that the "[r]ailroads are willing, if this Court should so require, to adopt guidelines which will guide the discretion of its employees in the matter of location, and maintenance and use of newsracks, so as to assure nondiscriminatory treatment." Br. for Appellants at 10–11.

■ But there is no evidence or finding that MTA has arbitrarily denied licenses or imposed unreasonably discriminatory terms on anyone, or that there is any threat of such conduct. It is doubtful that this record presents a justiciable controversy with respect to the reasonableness of the licensing terms. Therefore, while guidelines might be helpful, we will not require them at this time.

The judgment of the district court is reversed. This matter is remanded with directions to enter an order prohibiting MTA from discriminating unreasonably in fees charged for licensing of newsracks, with any fees subsequently established to be applied retroactively on a non-discriminatory basis.

efficient way of selling its product at MTA stations. If the licensing fees become unreasonably high, Gannett and other publishers would undoubtedly turn to alternate methods of distribution. This would result in the loss of substantial revenue to MTA, particularly in light of its policy of not allowing other types of vending machines at its stations.