CENTURY FEDERAL, INC., Plaintiff,

v.

CITY OF PALO ALTO, CALIFORNIA, et al., Defendants.

No. C–85–2168 EFL.

United States District Court, N.D. California.

Sept. 1, 1987.

## ORDER

LYNCH, District Judge.

The Court has already published two opinions in this case that set forth in great detail the facts surrounding this plaintiff's challenge to defendants' (hereinafter "the Cities") cable television (hereinafter

"CTV") franchising and regulatory scheme. *See Century Federal, Inc. v. City of Palo Alto,* 648 F.Supp. 1465 (N.D.Cal.1986) (*"Century Federal II"*); *Century Federal, Inc. v. City of Palo Alto,* 579 F.Supp. 1553 (N.D.Cal.1984). At the conclusion of the *Century Federal II* opinion, the Court stated that the Cities did not "necessarily have to open their cable facilities to all comers regardless of size, shape, quality or qualifications." 648 F.Supp. at 1478. In this next stage of the litigation, the Court has asked the parties [1] to address, through cross-motions for summary judgment, the constitutionality of the four major minimum requirements that the Cities seek to impose on all CTV franchisees: 1) access channels; 2) a "universal service" requirement; 3) state-of-the-art technical and equipment requirements; and 4) various fees, including bonding requirements, a security deposit, reimbursement for the Request for Proposals ("RFP") process, and franchise fees.

Having surveyed the relevant case law and applying the rationale and legal conclusions already reached in *Century Federal II,* the Court has concluded that defendants' access channel, universal service, and state-of-the-art requirements violate the first amendment of the United States Constitution.[2] The Court has also determined that subjecting CTV operators to municipality-imposed fees in excess of the Cities' costs from the franchising process is not *per se* unconstitutional, but the fees question raises a number of factual issues and unanswered questions of law that can-

---

1. On June 6, 1987, the Court certified to the United States Attorney General pursuant to 28 U.S.C. section 2403(a) that the instant cross-motions for summary judgment drew into question the constitutionality of the Cable Communications Policy Act of 1984, 47 U.S.C. section 521 et seq. ("Cable Act"). The United States responded that the Cable Act simply vests in local government bodies the authority to regulate cable television within the guidelines of the Act. Because the Cable Act authorizes, but does not mandate, the minimum requirements addressed in this Order, the Court does not herein purport to make any determination on the constitutionality of any particular provisions of the Act.

2. In addition to first amendment grounds, plaintiff has challenged the minimum requirements on fifth amendment "taking," equal protection, and substantive and procedural due process grounds. Because the Court invalidated the first three requirements under the first amendment, it was unnecessary to reach the other constitutional issues. Similarly, the Court found it unnecessary to reach any state constitutional issues. *See Century Federal II,* 648 F.Supp. at 1468 n. 5. As for the numerous constitutional challenges to the various fees imposed by the ordinance, see the Court's discussion in the text *infra.*

not be definitively decided on the record now before the Court.

## I. ACCESS CHANNEL REQUIREMENTS

■ In response to this Court's decision in *Century Federal II*, on March 9, 1987 the City Council of the City of Palo Alto, acting behalf of all defendants, passed Ordinance No. 3744 ("Ordinance"), which approved and awarded a franchise to plaintiff. The Ordinance requires all CTV operators to provide eight leased access channels to unaffiliated persons at negotiated rates. Ord. §§ 3.7.01–3.7.05. The Ordinance also requires three public and educational channels and two governmental channels ("PEG" access), *id.* §§ 4.2, 4.3, which the franchisees can satisfy by collaborating to provide a single set of such channels. *Id.* § 4.1.

Clearly, if such access requirements were applied to the traditional press, such as newspapers, they would violate the first amendment. *Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1401 n. 1 (9th Cir.1985), *aff'd*, 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) ("Imposing access requirements on the press would no doubt be invalid."); *see also Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Only once to date has the Supreme Court "sustained a limited government-enforced right of access," which was in the case of the broadcast media. *Pacific Gas*, 106 S.Ct. at 908 n. 6. This Court has already concluded that the justification for such governmental intrusion into the broadcast media, the physical scarcity of radiowaves, is inapplicable to the instant case. *Century Federal II*, 648 F.Supp. at 1471. Finding that " 'the analogy [of cable television] to more traditional

media is compelling,' " *id.* at 1472 (quoting *Quincy Cable TV, Inc. v. Federal Communications Commission*, 768 F.2d 1434, 1459 (D.C.Cir.1985)), this Court concluded that, except for its impact on the public domain, "the defendant Cities as a matter of law have failed to persuade this Court that there are any other differences attributable to cable television that can justify a degree of first amendment protection similar to that applied to the broadcast medium." *Century Federal II*, 648 F.Supp. at 1475.

Accordingly, the rationale in *Miami Herald* and *Pacific Gas* applies to the access requirements in the instant case. The Cities attempt to distinguish *Miami Herald* and *Pacific Gas* on the ground that the access requirements in those cases were triggered by the newspapers' content, while the access channels here are imposed automatically on all CTV operators regardless of any other programming they cablecast. The Cities read these cases too narrowly.

Regardless of how the Cities attempt to characterize the access channels, their result is undeniable: a CTV operator will be forced to cablecast material by other speakers that it might otherwise choose not to present. Just as in *Miami Herald* and *Pacific Gas*, such forced access has two independent, impermissible effects on a cable operator's right to speak. *See Pacific Gas*, 106 S.Ct. at 908.

First, forcing a speaker to communicate the views of another undoubtedly impacts the content of the speech of the primary speaker. In the case of the traditional press, and in this Court's opinion CTV operators, this impact is inconsistent with the principles of the first amendment. *See id.* The Cities cannot deny that the PEG channels, which are directly or indirectly controlled by city government,[3] could very well provide a conduit for criticism of the CTV operator. Even the leased commercial ac-

---

3. The content of the government-access channel is obviously under the direct control of the city governments. The Cities do note, however, that an *"independent"* community access organization ("CAO") will regulate the public and educational access channels. Ord. §§ 1.16, 4.3.02 & App.E. A simple reading of the Ordinances' relevant provisions, however, leaves this Court with grave doubts about how "independent" the CAO will be from the City Council and City Manager.

cess channels, over which the CTV operators have control, carry the impermissible risk of effecting the programming of the CTV operator. As the Supreme Court has stated, a "[g]overnment-enforced right of access *inescapably* 'dampens the vigor and limits the variety of public debate.'" *Id.* at 908 (emphasis in original) (quoting *Miami Herald*, 418 U.S. at 257, 94 S.Ct. at 2839).

Admittedly, the access channels provide other cable speakers regular and constant access that is not necessarily dependent on the content of any franchisee's speech. The content sought to be cablecast by the access users, however, will be influenced by what the franchisee cablecasts (why cablecast programming that is already on another channel?), and the reverse is also certain to be true: the material on the access channels will influence what the franchisee presents on its channels.[4] This indirect effect is no less impermissible than the direct effect of a right-to-reply statute in *Miami Herald*. *Pacific Gas*, 106 S.Ct. at 909.

The second impermissible effect of forced access channels is an intrusion into a CTV operator's considerable editorial functions, *see Century Federal*, 648 F.Supp. at 1472 & n. 12, which results regardless of whether the access would force a speaker to forego the communication of a particular opinion or material. *Miami Herald*, 418 U.S. at 258, 94 S.Ct. at 2840. Speaking of the function of newspaper editors, which this Court believes is closely analogous to the editorial functions of a CTV operator, the Supreme Court in *Miami Herald* stated: "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper ... constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with the First

Amendment guarantees of a free press...." *Id.*

Because the Ordinance's access requirements must be characterized as content-based, they "may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 1411, 55 L.Ed.2d 707 (1978); *Buckley v. Valeo*, 424 U.S. 1, 65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1974).

The Cities have simply not met this burden. As this Court stated in *Century Federal II* in a review of Supreme Court precedent, "'the purpose of the First Amendment is to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail....'" 648 F.Supp. at 1477 (quoting *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969)). The Constitution also "'command[s] that government itself shall not impede the free flow of ideas....'" *Century Federal II*, 648 F.Supp. at 1477 (quoting *Miami Herald*, 418 U.S. at 252, 94 S.Ct. at 2837). The access channels forced upon plaintiff by the Cities carry the inherent risk that a franchisee's speech will be chilled and the direct, undeniable impact of intruding into the franchisee's editorial control and judgment of what to cablecast and what not to cablecast. Neither result can be tolerated under the first amendment in the name of an "attitude that government knows best how to fine tune the flow of information to which [the people] have access." *Century Federal II*, 648 F.Supp. at 1477.

## II. "UNIVERSAL SERVICE" REQUIREMENT

■ The Ordinance requires the franchisee to wire the entire Service Area ex-

---

**4.** The Supreme Court has never required an actual showing of such an influence or chilling effect on the primary speaker's content. There was no such showing in either *Miami Herald* or *Pacific Gas;* it is the mere risk of such a chilling effect that is inconsistent with the first amend-

ment. *But see Pacific Gas*, 106 S.Ct. at 919–20 (Rehnquist, J., dissenting) (arguing that any such effect should be direct and immediate before the heightened first amendment scrutiny of *Miami Herald* should be applied).

cept where access is not feasible. Ord. § 3.2.

The Court finds that essentially the same analysis on access channels applies here to invalidate the universal service requirement. Could the Cities require a newspaper, movie house, or bookstore to deliver to or be located in a particular geographic area of the community on the ground that it is in the best first amendment interests of the residents in that area? Surely, the answer is no.

The first amendment protects both the right to speak freely and the right to refrain from speaking at all. *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). As the Supreme Court stated in *Pacific Gas:* "The essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas.... There is necessarily ... a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." *Pacific Gas,* 106 S.Ct. at 909 (emphasis in original) (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985)).

Dictating to whom plaintiff cablecasts is an impermissible burden on a CTV operator's first amendment right to determine where and when it speaks. As with the access channel requirement, the Court finds this to be a content-based regulation that the Cities have not sustained by showing that the "regulation is a precisely drawn means of serving a compelling state interest." *See Consolidated Edison,* 447 U.S. at 540, 100 S.Ct. at 2334; *Bellotti,* 435 U.S. at 786, 98 S.Ct. at 1421; *Buckley,* 424 U.S. at 65, 96 S.Ct. at 656.

## III. "STATE–OF–THE–ART" REQUIREMENTS

The Ordinance requires the franchisee to construct a "state-of-the-art" system. Ord. § 3.1. The Ordinance further dictates that "to the extent that the Company and the City reasonably mutually determine that it is economically viable and feasible to do so," the franchisee shall maintain and upgrade its services and technical performance "to keep pace with developments in the State-of-the-Art of [cable] technology." *Id.* § 3.9.01. The Ordinance also mandates several specific equipment and technological requirements, including that the cable system be fully two-way and interactive so that it can support services such as two-way conferencing and high-seed data transfer, *id.* §§ 3.6, 4.5.01 & App. A, and that two coaxial cables are installed, only one of which need be activated immediately. *Id.* App. A.

The Court finds that the state-of-the-art requirements in the Ordinance are government regulations of noncommunicative aspects of speech. The propriety of governmental regulations of noncommunicative aspects of speech is judged by the standard enunciated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *Century Federal II,* 648 F.Supp. at 1475. Under the *O'Brien* test, a regulation is constitutional only if (1) it is within the constitutional power of government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free speech; and (4) the incidental restriction on first amendment freedom is no greater than is essential to further that interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. The Cities bear the burden of proving that all of the elements of this test are satisfied. *Century Federal II,* 648 F.Supp. at 1475.

Because this Court finds that, as a matter of law, the Cities have not satisfied the second prong of the *O'Brien* test, it is not necessary to analyze the state-of-the-art requirements under the other elements of the test.

The only legally recognized important or substantial governmental interest proffered by the Cities to justify the technical/equipment requirements is cable television's disruption to the public domain. *See id.* at 1477. The gist of the Cities' vague argument here is that unless the Cities ensure the installation of a technologically advanced system, which includes all the features the Cities believe their resi-

dents would use, the CTV operators will need to frequently dig up old cables and unnecessarily disrupt the public domain. *See* Defendants' Reply Memorandum in Support of Motion for Partial Summary Judgment at 1. The Cities provide absolutely no probative evidence supporting the reasonable possibility that this might be the case. In light of the Cities' burden in satisfying the *O'Brien* test, such speculation cannot save the state-of-the-art requirements.

The Cities have not created a genuine issue of material fact in support of their argument that the technical/equipment requirements further the important or substantial government interest in minimizing cable television's disruption to the public domain. *See Century Federal II,* 648 F.Supp. at 1477–78. Consequently, the state-of-the-art requirements are an impermissible burden on plaintiff's first amendment rights and must be strickened from the Ordinance.

## IV. FEES

■ The Ordinance requires the franchisee to meet a number of financial obligations. First, the Ordinance requires the franchisee to post construction performance and payment bonds in the amounts of $1,000,000 and $500,000 respectively, and at the discretion of the City Manager, a franchise performance bond in an amount up to $100,000. Ord. § 6.16. Second, the Ordinance requires the franchisee to reimburse the Cities for a pro-rata share of the $350,000 that the Cities incurred in consulting fees during the RFP process, *id.* § 10.2.02, and to reimburse the Cities for any costs they incur in renewal or amendment of the franchise. *Id.* § 10.2.04. Third, the Ordinance requires the franchisee to provide a "security fund" in a total initial amount of $1,000,000. *Id.* § 17.2. Finally, the franchisee is obligated to pay the Cities an annual franchise fee of five percent of its annual gross revenue. *Id.* § 10.1.01.

Quite understandably in light of the page limitations imposed on the parties' briefs and the number and complexity of the issues that have been addressed on the instant motions for summary judgment, the briefing and evidentiary support on the Ordinance's various financial provisions was too vague and incomplete for the Court to make any definite determinations on these provisions. Before addressing which matters require additional briefing and evidentiary support, the Court will make several observations about the applicable law.

Plaintiff agrees that the Cities are entitled to require construction and performance bonds, but argue that the amount of the bonds should be no greater than that imposed on Pacific Bell.

Both sides also agree that the Cities can pass onto the CTV operators the reasonable administrative costs of the franchising program. *See Murdock v. Pennsylvania,* 319 U.S. 105, 113–14, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943); *Fernandes v. Limmer,* 663 F.2d 619, 633 (5th Cir.1981), *cert. denied,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982); *Baldwin v. Redwood City,* 540 F.2d 1360, 1371 (9th Cir.1976), *cert. denied,* 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977).

Plaintiff, however, contends that any fees imposed by the Cities beyond such administrative costs is a discriminatory tax on the press that burdens rights protected by the first amendment. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 582, 103 S.Ct. 1365, 1370, 75 L.Ed.2d 295 (1983). In *Minneapolis Star,* the Supreme Court struck down a state "use tax" on the cost beyond the first $100,000 of paper and ink consumed in the course of the production of a written publication. The practical effect of the "use tax" was to impact only the large newspapers in the state. The Court determined that "a tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action," *id.* at 592–93, 103 S.Ct. at 1375–76, and that to satisfy that burden, the government must demonstrate "a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." *Id.* at 585, 103 S.Ct. at 1371. The Court con-

cluded that although the asserted state interest, generating revenue, was compelling, it could be achieved as effectively by a general tax on all businesses. *Id.* at 586, 103 S.Ct. at 1373.

While disputing the application of the *Minneapolis Star* rationale to invalidate the Ordinance's financial provisions, the Cities cite for support *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767 (2d Cir.1984), and *Erie Telecommunications, Inc. v. City of Erie*, 659 F.Supp. 580 (W.D.Pa.1987). *Gannett* upheld a revenue-raising fee imposed by the Metropolitan Transportation Authority ("MTA") on the placement of coin-operated newspaper vending machines in MTA commuter train stations. The court in *Gannett* distinguished between the cases prohibiting licensing fees and the facts before it on the ground that in the former cases the government acted in a government capacity in "raising general revenue under the guise of defraying administrative costs," 745 F.2d at 774, while the MTA operated in a proprietary capacity by charging reasonable rent for the use of business property that it happened to own. *Id.* at 775. In *Erie*, a district court recently upheld a municipality-imposed annual franchise fee on CTV operators equal to five percent of the operator's annual gross revenues. The court held that such fees were merely fair rental value of the property interest the CTV operator received with the franchise. "[A]s a city holds the streets in trust for the public, it would be a dereliction of a city's fiduciary duty to grant franchise rights ... without receiving the fair market value for the property." *Erie*, 659 F.Supp. at 595.

Plaintiff's brief was notably silent on the issue of whether the Cities could impose a franchise fee based on plaintiff's substantial use of the public domain. Without deciding the issue, this Court is fairly confident that such a fee, at least if set by the fair market value of the property interest the CTV operator receives, is sustainable under the *O'Brien* test. Clearly, however, any fee beyond that designed to offset administrative costs is not *per se* unconstitutional.

In order to determine whether there exists any genuine issues of material fact on the challenge to the fees, the Court requests both sides to submit the following additional support:

1) By 5 p.m., Friday, September 18, 1987, the Cities should file with the Court a ten-page brief arguing for the constitutionality validity of *each* financial obligation imposed on plaintiff by the Ordinance. The brief should include a discussion of the *Minneapolis Star, Gannett,* and *Erie Telecommunications* cases. One of the Court's particular concerns is whether the application of the *O'Brien* test, specifically the fourth prong, empowers this Court to limit the amount of any franchise fee to no greater than the fair rental value of the property interest plaintiff receives with the franchise. Finally, the brief should address all of the plaintiff's constitutional challenges to the fees, with special attention to the equal protection implications. *See, e.g., Erie*, 659 F.Supp. at 603–04.

The Cities' brief must also be supported with evidentiary documentation and declarations answering the following questions:

a) How does the amount of the construction and performance bonds required by the Ordinance compare with the amounts the Cities require of similarly situated users of the public domain?

b) What do the Cities contend their administrative costs are, and are the reimbursement provisions at sections 10.2.02 and 10.2.04 designed to cover such costs? Also, do the Cities contend that plaintiff should be required to help fund an Ordinance that has, in large part, been declared unconstitutional?

c) What exactly is the purpose of the "security fund" at section 17.2? What costs are this fund designed to cover? The Court's reading of the provision suggests that the fund is simply a kind of liquidated-damages fund. If this is indeed its purpose, can it withstand constitutional muster?

d) Do the Cities contend that the five percent annual franchise fee is a reason-

able charge for plaintiff's use of the public domain?

2) Plaintiff may respond by 5 p.m., October 2, 1987 with a ten-page brief and any supporting documentation. Specifically, plaintiff should address the application of the reasoning underlying *Gannett* and *Erie Telecommunications.*

3) No reply brief will be necessary. No oral argument will be heard on the fees unless so otherwise ordered by the Court. Finally, the United States is not required to submit a supplemental brief on the fees.

IT IS SO ORDERED.

IT IS ALSO ORDERED that the parties appear for a status conference on Thursday, October 8, 1987 at 8:45 a.m.