NEW YORK NEWS, INC., Plaintiff,

v.

METROPOLITAN TRANSPORTATION AUTHORITY, New York City Transit Authority and Robert Kiley, Chairman of the Metropolitan Transportation Authority, Defendants,

and

Ron Reale, as President of the Police Benevolent Association, New York City Transit Police Department, and Local 100, Transport Workers Union of America, AFL–CIO, Intervenors.

No. 90 Civ. 7674 (MGC).

United States District Court,
S.D. New York.

Dec. 18, 1990.

---

Coudert Brothers by Kevin W. Goering, and Wachtell, Lipton, Rosen & Katz, New York City by Herbert M. Wachtell, Norman Redlich, Mark Wolinsky, John F. Savarese, Ralph M. Levene, Scott E. Eckas, for plaintiff.

Susan E. Weiner, Deputy Gen. Counsel, Richard K. Bernard, Acting Gen. Counsel, Metropolitan Transp. Authority, New York City (Florence Dean, Maureen Grady, of counsel), for defendants.

Agulnick & Gogel, New York City by William A. Gogel, for intervenor Ron Reale.

O'Donnell & Schwartz, New York City by David B. Rosen, Carl Rachlin, for intervenor Local 100.

New York Civil Liberties Union Foundation, New York City by Norman Siegel, Arthur Eisenberg, Earl Ward, for amicus curiae.

## OPINION AND ORDER

CEDARBAUM, District Judge.

The question presented by this motion for a preliminary injunction is whether plaintiff is likely to succeed at trial in showing that by revoking permits for the sale of *The Daily News* by direct sellers ("hawkers") because of threatened unlawful conduct, defendants abridged plaintiff's freedom of speech and of the press in violation of the First and Fourteenth Amendments to the United States Constitution. For the reasons discussed below, plaintiff is likely to succeed in establishing that the revocation was unconstitutional because it was not reasonable regulation, and accordingly, plaintiff's motion for a preliminary injunction is granted to the extent indicated below.

### PARTIES

Plaintiff is the publisher of *The Daily News*, a daily newspaper. Defendants Metropolitan Transportation Authority ("MTA") and the New York City Transit Authority ("TA") are public benefit corporations which are responsible for the operation of the subway and commuter railroad systems serving the New York metropolitan area, including the Long Island Rail Road and the Metro–North Commuter Railroad ("Metro–North"). Defendant Robert Kiley is the Chairman of the MTA and the TA. Intervenor Ron Reale is the president of the Police Benevolent Association for the New York City Transit Police Department. Intervenor Local 100, Transport Workers Union of America, AFL–CIO, is the collective bargaining representative of some 35,000 hourly rated TA employees responsible for the operation and maintenance of the New York City bus and subway system. The New York Civil Liberties Union has filed a brief amicus curiae in support of plaintiff's position.

### THE FACTS

Nine of the ten unions representing employees of *The Daily News* are on strike. Before the strike began on October 25, 1990, most newsstands in the subway and commuter train stations operated by defendants offered *The Daily News* for sale. Since the strike, most of these newsstands have stopped selling *The Daily News*. Plaintiff's verified complaint states that direct sales of *The Daily News* through the use of hawkers is plaintiff's only viable means of distributing the newspaper in the system.

On November 28, 1990, plaintiff and the MTA entered into two agreements, described as "permits," allowing plaintiff's "hawkers" to sell *The Daily News* at designated locations in the subway and train systems. One permit authorized sales by no more than three hawkers at each of 43 Long Island Rail Road and 15 Metro–North commuter train stations, but not within 100 feet of any newsstand selling *The Daily News*. The second permit authorized sales by no more than three hawkers at each of 120 subway stations, provided sales were made within 10 feet of a newsstand, newspaper rack, or newspaper vending machine not selling *The Daily News*. Both permits could be terminated by either side upon 48 hours' written notice or by the MTA upon less than 48 hours' written notice "in the event of an emergency."

On the day after defendants granted the permits to plaintiff, representatives of several transportation workers' unions, including intervenor Local 100, informed defendants that the presence of hawkers selling *The Daily News* in the transit system would be likely to disrupt transportation services and create safety risks for MTA employees and riders. Defendants have submitted affidavits describing telephone conversations with union leaders and copies of letters and telegrams received from union leaders. According to the affidavits, officials of defendants received the following communications before the permits were revoked:

(1) Gary Dellaverson, Director of Labor Relations for the MTA, states that an attorney representing the AFL–CIO told him that if the MTA continued to allow *The Daily News* to be sold through hawkers, "MTA should expect 'trouble'." Dellaverson Affidavit, ¶ 3.

136

(2) Dellaverson states that Damaso Seda, the Secretary Treasurer of Local 100, telephoned him "to express the union's [Local 100's] anger at allowing MTA to be in the middle of *The Daily News* strike. He said he could not guarantee what his members will do, that this was a very violent strike, and that he feared for the safety of his members and MTA passengers and that he was instructing his members to take whatever steps are necessary to insure his members own safety." *Id.,* ¶ 4.

(3) Dellaverson states that Barry Feinstein, a member of the MTA's Board of Directors, as well as the President of the New York State Public Employee Conference and of Local 237, International Brotherhood of Teamsters, which represents 20,000 municipal employees, "telephoned [Dellaverson] to register his dissatisfaction with the presence of the hawkers in the systems, and said that MTA should expect 'plenty of trouble.'" *Id.,* ¶ 5.

(4) Donald Nelson, Executive Vice President of Metro–North, states that he had a series of telephone conversations with James Phelan, General Chairman of the United Transportation Union, which represents Metro–North conductors and trainmen. Nelson states that Phelan told him that officials of the striking *Daily News* unions had communicated to him "that there would be handbilling and picketing of Metro–North property by the strikers if hawkers sold the *Daily News.*" Nelson states that Phelan said "his members would not cross those lines and would not report for work." Nelson Affidavit, ¶¶ 3–4.

(5) Phelan sent a letter to defendant Kiley which stated that the presence of hawkers in Metro–North stations "is an insult to every MTA employee who is a union member and deliberately puts MTA employees and the traveling public at great personal risk. Should MTA's action result in danger or potential threat of danger to our members, the UTU is prepared to defend a member's right to decline to enter the area involved." *Id.,* Exhibit C.

(6) Chris Silvera, Secretary–Treasurer of Local 808 of the International Brotherhood of Teamsters, which represents Metro–North maintenance of way workers, sent Nelson a letter and a telegram which stated that "Local 808 is totally and unequivocally opposed" to MTA's decision to grant the permits to *The Daily News,* that *The Daily News* strike "has been marred/enforced with 860 documented acts of violence," and that "[i]n the event that striking picketers are present around Grand Central Terminal we will inform our members of their rights under the Federal Rail Safety Act not to enter the property." *Id.,* Exhibits D, E.

(7) Andrew Paul, Assistant Director of Labor Relations for Metro–North, states that he had three telephone conversations with James Phelan. Phelan told Paul that he had been informed by officials of the striking *Daily News* unions that "supporters of striking employees of the *Daily News* would begin handbilling at Metro–North stations," which would "confuse Metro–North employees who would very likely perceive this handbilling by strike supporters as a picket line which they might well not cross." Paul Affidavit, ¶¶ 2, 4.

(8) Anthony Conti, a Labor Relations Representative for Metro–North, stated that Howard Dash, Regional Chairman of United Transportation Union–Yardmasters, which represents Metro–North yardmasters, told him during a phone conversation that "due to the violent nature of the *Daily News'* strike should there be any picket lines he would instruct his members that pursuant to 'a provision' of the Railway Labor Act they would not have to cross those lines." Conti Affidavit, ¶ 3.

On the night of November 29, 1990, the MTA sent plaintiff a letter, the entire text of which is as follows:

Please be advised that effective immediately the permits for the direct sale of newspapers in the New York City Subway System and in the Metropolitan Transportation Authority's (the "MTA")

commuter rail system dated November 28, 1990 are terminated, effective immediately, pursuant to the emergency provision of said permits.

Goering Declaration, Exhibit B.

In an affidavit submitted by plaintiff, David Hiller, Vice President and General Counsel of Tribune Company, plaintiff's parent company, states that he was told by Robert Bergen, General Counsel of Metro–North, that the permits were being terminated "because MTA unions had threatened a work stoppage if the *Daily News* were sold at MTA locations and striking News workers picketed these locations." Hiller Reply Affidavit, ¶ 3.

On the following day, plaintiff filed this lawsuit attacking defendants' regulations as invalid on their face and as applied under the First and Fourteenth Amendments and asserting that defendants' actions violated the Fourteenth Amendment due process and equal protection clauses and 42 U.S.C. § 1983. Plaintiff moved by order to show cause for a temporary restraining order and a preliminary injunction. After hearing both sides, I granted a temporary restraining order directing defendants to allow plaintiff's hawkers to sell *The Daily News* in accordance with the terms and conditions of the permits pending determination of plaintiff's motion for a preliminary injunction. On December 7 and December 14, I extended the temporary restraining order. No evidentiary hearing was held because all parties agreed that an evidentiary hearing was unnecessary.

## DISCUSSION

In order to obtain a preliminary injunction, plaintiff must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

### 1. *Irreparable Harm*

Irreparable harm means injury for which a monetary award cannot be adequate compensation. *Jackson Dairy v. H.P. Hood,* 596 F.2d at 72. The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).

Plaintiff has made a showing of irreparable harm. Plaintiff has established a restriction of its right to sell newspapers, which is protected by the First Amendment. *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 768, 108 S.Ct. 2138, 2149, 100 L.Ed.2d 771 (1988); *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767, 772 (2d Cir.1984). The injury to this right is defendants' revocation of the permits and refusal to allow plaintiff to sell its newspapers through hawkers at stations at which newsstands refuse to carry those newspapers.

### 2. *Likelihood of Success*

#### a. *The unreasonableness of the revocation of the permits*

The Supreme Court has divided public property into three categories for purposes of First Amendment analysis. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). The standard to be applied in testing defendants' restriction of plaintiff's exercise of its First Amendment right to sell newspapers depends upon how the public areas of the train and subway stations are characterized. *Perry,* 460 U.S. at 44, 103 S.Ct. at 954; *Gannett v. MTA,* 745 F.2d at 772. The first category consists of traditional public forums such as streets and parks. *Perry,* 460 U.S. at 45, 103 S.Ct. at 955. The second category is public property designated by the government for use by the public as a place for expressive activity. *Id.* The third category is "[p]ublic property which is not by tradition or designation a forum for public communication." *Id.* at 46, 103 S.Ct. at 955.

The Second Circuit has held that the public areas of MTA stations are in the third category. *Gannett v. MTA*, 745 F.2d at 773. Property in the third category "can still serve as a forum for First Amendment expression if the expression is appropriate for the property and is not 'incompatible with the normal activity of a particular place at a particular time.'" *Id.* (citations omitted). The Second Circuit has also noted that the public areas of MTA stations are appropriate forums for the sale of newspapers because "[t]he thousands of commuters who pass through the stations each day provide a ready market for morning newspapers." *Id.* The same reasoning unquestionably applies to the public areas of subway stations through which millions of travelers pass virtually every day.

[5] The standard for measuring the constitutionality of a particular regulation of speech on property in the third category is reasonableness. *United States v. Kokinda*, 497 U.S. ——, ——, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571, 581 (1990); *Perry*, 460 U.S. at 46, 103 S.Ct. at 955; *Gannett v. MTA*, 745 F.2d at 773. Defendants argue that their refusal to allow plaintiff to sell its newspapers through hawkers is reasonable because of the danger that the presence of *The Daily News* hawkers in the transit system will create a safety risk to MTA employees and passengers and because of the possibility that transit operations will be disrupted if *The Daily News* unions picket or handbill MTA facilities and transit workers refuse to report to work.

■ Based on the undisputed facts, I find that plaintiff is likely to be able to show that defendants revoked the permits solely because of fear of illegal conduct by *The Daily News* strikers and the transit unions, and that such interference with freedom of speech and of the press is unreasonable government action.

■ Defendants' revocation of the permit for the subway system was unreasonable because the danger and disruption defendants anticipated in the subway system would have been illegally caused. Violence by the strikers, of course, is illegal. A strike, job action, or refusal to report to work by defendants' employees who work in the New York City subway system is illegal under the Taylor Law. N.Y.Civil Service Law § 210 (McKinney 1983).[1] When one person attempts by illegal conduct to inhibit another's constitutionally protected speech on public property appropriate to that speech, the reasonable governmental response is to seek to prevent the illegal conduct, not the constitutionally protected speech. Indeed, in the event of a strike or other job action by subway workers, the Taylor Law would require defendants to seek an injunction against the illegal action. *Id.* § 211. It is against public policy to accept a threat of illegal conduct as justification for restricting First Amendment rights. Thus, a government agency cannot use a threat of illegal conduct as a rational basis for interfering with freedom of speech or the press.

Defendants' revocation of the portion of the permit pertaining to Long Island Rail Road stations was also unreasonable. Defendants have not submitted any evidence showing that when they revoked the permits they had received any communications that the presence of hawkers at Long Island Rail Road stations would cause any danger or disruption of service.

So too, defendants' revocation of the portion of the permit pertaining to Metro–North stations was unreasonable. First, it should be noted that the threat by Silvera was only "in the event that striking picketers are present around Grand Central Terminal." Grand Central Terminal is not one of the railroad stations in which hawking of *The Daily News* is authorized by the revoked permit. But far more fundamental is that all of the communications from unions representing Metro–North employees are premised on predictions of violence. Although the MTA argues that its judg-

1. The Supreme Court held in *United Transportation Union v. Long Island Rail Road Co.* that employees of the Long Island Rail Road are not subject to the Taylor Law. 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982). Although Metro–North and its employees were not parties in that case, the same reasoning would seem to apply to them as well.

ment of the imminence of the threatened conduct must control, it does not contend that the threatened conduct is lawful. On the contrary, it argues that it may yield to threats of unlawful conduct if in its judgment such conduct may disrupt the transportation system.

I am well aware that I must not substitute my judgment for that of the defendants in assessing the immediacy and seriousness of the threats that have been made, and I have not done so. But when I find, as I have, that the response by defendants to those threats is unreasonable, then the court must intervene to assure that the governmental authorities do not yield to protests and unlawful pressures at the expense of stifling constitutionally protected freedoms.

At oral argument, although not at the time the permits were revoked, defendants argued that their refusal to permit plaintiff to sell its newspapers through hawkers in subway and train stations was reasonable because hawking contributes to congestion and other conditions that interfere with the safe and efficient operation of the transit system. Plaintiff is likely to succeed on the merits in spite of this argument for several reasons. First, defendants concede that their regulations do not prohibit hawking of newspapers.[2] Moreover, the effect of hawking on the operation of the transit system was not the real reason for which defendants revoked plaintiff's permits. Defendants granted plaintiff permits to use hawkers in spite of these considerations. They revoked the permits immediately after the transit unions objected. Furthermore, defendants have not offered a reasonable distinction between hawking of newspapers and other activities they do permit, such as solicitation of charitable donations. *See* N.Y.Comp.R. & Regs., tit. 21, § 1050.6(c) (as amended December 29, 1989), available in N.Y.St.Reg. Vol. XII, Issue 3 at 37 (January 17, 1990); Levine Affidavit, Exhibit A.

b. *The facial invalidity of defendants' regulations*

■ Plaintiffs are also likely to succeed on their claim that defendants' regulations are facially invalid because they give MTA officials unfettered discretion over the issuance of permits for the hawking of newspapers in the transit system.

Defendants have four sets of regulations that govern the sale of newspapers in the transit system. New York Code of Rules and Regulations § 1050.6(b) provides:

No person, *unless duly authorized by the [Metropolitan Transit] Authority*, shall engage in any commercial activity upon any facility or conveyance.... Commercial activities include:

(1) the advertising, display, sale, lease, offer for sale or lease, or distribution of food, goods, services or entertainment (including the free distribution of promotional goods or materials)....

*Id.*, § 1050.6(b) (emphasis added). This regulation does not set out the standards upon which authorization by the MTA will be based.

The "Rules and Regulations Governing the Conduct and Safety of the Public in the Use of Metro–North Commuter Railroad Company Terminals, Stations, and Trains" provide:

No act otherwise prohibited by any of these Rules may be undertaken *unless specifically authorized* by the terms of any written contract, agreement, permit, license or lease of the type issued in the ordinary course of business of Metro–North....

Levine Affidavit, Exhibit B (emphasis added) (adopted but not published at N.Y.St. Reg. Vol. XII, Issue 15 at 39 (April 11, 1990), to be codified at N.Y.Comp.R. & Reg. tit. 21, § 1085.3(a)). Metro–North's rules and regulations do not otherwise provide for the sale of newspapers, and they do not set out the standards by which Metro–North will determine whether to enter into contracts and agreements or grant permits, licenses, or leases.

---

**2.** I do not have to reach the considerable constitutional questions that would be raised by a

total ban on hawking of newspapers in the transit system.

The Long Island Rail Road's rules and regulations are substantially the same as Metro–North's. Goering Affidavit, Exhibit C (adopted but not published at N.Y.St. Reg. Vol. XII, Issue 15 at 36 (April 11, 1990), to be codified at N.Y.Comp.R. & Reg. tit. 21, § 1097).

The MTA Real Estate Department Guidelines for Distribution of Newspapers, Books and Magazines provide for sale of newspapers at newsstands authorized by the MTA and at temporary newsracks pending reconstruction of certain newsstands. Levine Affidavit, Exhibit F. The only other provision for distribution of publications under the Guidelines pertains to distribution without charge or sales by charitable organizations.

None of the rules and regulations cited by any party set out standards by which the MTA will issue permits for hawking of newspapers. Indeed, the MTA Real Estate Guidelines apparently do not contemplate distribution of newspapers by hawkers or vending machines, although the MTA admits that it has issued permits for both types of distribution.

■ "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). "[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood v. Plain Dealer*, 486 U.S. at 763, 108 S.Ct. at 2147. The absence of standards violates the First Amendment because it may inhibit those newspapers seeking permits from expressing views critical of the MTA or its union employees. *See Id.* at 757–758, 108 S.Ct. at 2143–2144. The transit system's non-forum status does not eliminate the constitutional requirement of standards for discretionary licensing, although it may require

that any standards promulgated be reviewed only for reasonableness instead of some higher level of scrutiny.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for a preliminary injunction is granted to the extent that pending final adjudication of this case defendants are enjoined from unilaterally revoking the permits previously issued to plaintiff without the permission of this Court.

SO ORDERED.